JESSE A. CRIPPS, SBN 222285
    jcripps@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

SARAH ZENEWICZ, SBN 258068
    szenewicz@gibsondunn.com
JOSEPH C. HANSEN, SBN 275147
    jhansen@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA  94105-2933
Telephone: (415) 393-8200
Facsimile: (415) 374-8400

Attorneys for Defendant
TAYLOR FARMS PACIFIC, INC.

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIA DEL CARMEN PENA, CONSUELO HERNANDEZ, LETICIA SUAREZ, ROSEMARY DAIL, and WENDELL T. MORRIS on behalf of themselves and on behalf of all other similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>TAYLOR FARMS PACIFIC, INC., d/b/a TAYLOR FARMS, ABEL MENDOZA, INC., MANPOWER, INC., QUALITY FARM LABOR, INC., SLINGSHOT CONNECTIONS, LLC and DOES 5-50, inclusive,<br><br>Defendants. | NO. 2:13-cv-01282-KJM-AC<br><br>**DEFENDANT TAYLOR FARMS PACIFIC, INC.'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>[San Joaquin Superior Court, Case No. 39-2012-00276847-CU-OE-STK]<br><br>[*Motion for Partial Summary Judgment; Declaration of Joseph C. Hansen; Request for Judicial Notice filed concurrently herewith*]<br><br>Date:    August 8, 2014<br>Time:    10:00 a.m.<br>Place:   Courtroom 3<br>Judge:   The Honorable Kimberly J. Mueller |

Gibson, Dunn & Crutcher LLP

DEFENDANT TAYLOR FARMS PACIFIC, INC.'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT; CASE NO. 2:13-cv-01282-KJM-AC

Defendant Taylor Farms Pacific ("Taylor Farms Pacific") hereby submits, pursuant to Local Rule 260(a), its separate statement of undisputed facts in support of its Motion for Partial Summary Judgment ("Motion").

The following undisputed facts are applicable to all issues submitted in Taylor Farms Pacific's Motion:

| Undisputed Fact | Supporting Evidence |
|---|---|
| **Maria del Carmen Pena** ||
| 1. Pena was hired and paid by Abel Mendoza in connection with her work at Taylor Farms Pacific from May 2006 to April 2010. | ECF No. 101, Seventh Amended Complaint ("7AC") ¶ 24.<br><br>Declaration of Joseph C. Hansen ("Hansen Decl."), Ex. A. (hereinafter cited as "Pena Dep.") at 39:17-41:7. |
| 2. Pena testified as follows:<br><br>Q. And did you work in the labels up until 2010 when you left Taylor Farms Pacific?<br>A. Well, I would go in the label area a little bit, and then I would go to the fruit room.<br>Q. And that was between 2008 up through the end of your work in 2010?<br>A. For a time.<br>Q. For how long of a period?<br>A. About six months.<br>Q. You would go back and forth between fruit and labels for a six-month period between 2008 and 2010?<br>A. Yes.<br>Q. Between 2008 and 2010 did you work in any other areas other than fruit and labels?<br>A. Sometimes where I -- for a week or two they would use me for cleanup.<br>Q. Any other areas?<br>A. Sometimes for short periods of time in the tomatoes.<br>***<br>Q. You said that you started in the label area, correct?<br>A. Yes.<br>Q. And that you would also from time to time work in the fruit area, the tomato area and doing cleanup; is that right?<br>A. Yes.<br>Q. Are the fruit and tomato areas in the same room? | Pena Dep. at 55:21-56:14, 58:01-59:11. |

Gibson, Dunn &
Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| A. Yes.<br>Q. When you were doing label work that was in a different room than the fruit and tomato area; is that right?<br>A. Yes.<br>Q. And did you have -- strike that. That was in the warehouse; is that right?<br>A. Yes.<br>Q. Okay. And you also said that you did cleanup work. Where did you do the cleanup work?<br>A. In the dining room and in the bathrooms. The office.<br>Q. Anywhere else?<br>A. No, that's all.<br>Q. When you did the cleanup work you were working somewhere other than the production floor; is that right?<br>A. Yes.<br>Q. So the work that you did in the production area was labels in the warehouse on some days, right?<br>A. Yes.<br>Q. And fruit and tomato work in the fruit and tomato room on other days, right?<br>A. Yes.<br>Q. Did you have a different crew leader for the time you worked doing cleanup?<br>A. Yes. | |
| 3.   Pena testified as follows:<br><br>Q. And you believe it took you one minute to wash your hands and sanitize your hands?<br>A. One or two minutes.<br>Q. Do you believe that it took you two minutes sometimes to wash your hands and sanitize them?<br>MR. CHANDLER: Objection. Argumentative.<br>A. I imagine. I haven't – I didn't clock myself on a watch. I just calculated the time.<br>***<br>Q. How long did it take to put your gear on for the label room?<br>A. About a minute. Because it was just the frock and -- and the hair net and the helmet that was faster.<br>Q. Faster than what?<br>A. Because when we worked in the fruit it was more time.<br>Q. Because you had different gear? | Pena Dep. at 69:20-70:03, 72:22-:73:18. |

Gibson, Dunn & Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| A. Because there I also had to wear an apron and also arm -- plastic arm protection and then we had to put on a cotton glove, cloth glove, and a metal glove and a plastic glove so the others wouldn't get wet.<br>Q. Was there anything else that you had to put on when you worked in the fruit and tomato room?<br>A. At this time this is all I recall.<br>Q. Okay. And how long do you estimate that it took you to put on your gear when you worked in the fruit and tomato room?<br>MR. CHANDLER: Objection. Vague and ambiguous.<br>A. To put on all that gear, about three minutes. | |
| 4. Pena testified as follows:<br><br>Q. When you worked on labels what entrance to the plant did you use when you first arrived in the morning?<br>A. I had to enter and punch in.<br>Q. Where did you enter, using the door that comes into the cafeteria?<br>A. Yes.<br>Q. Okay. And did you bring your lunch with you?<br>A. I would leave it in the cafeteria.<br>Q. Okay. And once you would leave your lunch in the cafeteria when you were working on labels what is the very next thing that you would do when you arrived in the morning?<br>A. Well, in labels when I was working there I had to punch in.<br>Q. And then what did you do?<br>A. I would put on an apron, and then I had to go in to work.<br>***<br>Q. Okay. Just so we have the testimony correct, what did you put on before going to labels after you punched in?<br>A. The apron, the hair net and the helmet.<br>***<br>Q. After you punched in?<br>A. First I had to do all of those things I said, and then I would punch in. | Pena Dep. at 62:11-63:03, 63:22-:25, 64:08-:10 |
| 5. Pena testified as follows:<br><br>Q. Okay. So approximately in 2008 when | Pena Dep. at 89:05-90:03, 141:12-:16 |

Gibson, Dunn & Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| you left at the end of the day you would take your equipment off first and then punch out?<br>MR. CHANDLER: Objection. Vague and ambiguous. Misstates testimony.<br>Q. Is that right?<br>A. Yes, it was when it changed.<br>Q. And who told you that things were changing?<br>A. The one that was in charge of the fruit was the one that told us to do it. So when you were going home, take the gear off and punch out. Or sometimes -- that was when, like I explained to you, that we had to get out, leave, take off our gear and punch out afterwards.<br>Q. Okay. And how many times did he tell you that between approximately 2008 and the time you left in 2010?<br>A. Well, I don't know exactly the number of times.<br>Q. Can you estimate?<br>A. About four times.<br>Q. And did you follow his instructions?<br>A. Yes.<br>***<br>Q. Okay. When you worked in labels and you punched out at the end of the day did you take off your gear before punching out like you described for the tomato and fruit room?<br>A. Yes. | |
| 6.  Pena testified as follows:<br><br>Q. When you were working as a housekeeper at the facility would you go in through the cafeteria door at the beginning of the day?<br>A. Yes.<br>Q. And what was the very next thing you would do after going into the cafeteria door when you were working as a housekeeper?<br>A. I didn't put anything on. I just had to punch in.<br>Q. Okay. Where did you go to punch in?<br>A. I had to punch in where the clock is, where the frocks are, because that's where the clock is.<br>Q. And how far away was the hygiene room where the clock you used was from the cafeteria where you entered the building?<br>A. The distance. Walking in feet it would -- | Pena Dep. at 82:09-84:05, 91:16-92:02. |

Gibson, Dunn & Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| about 30 seconds walking.<br>Q. And how confident do you feel that it would take 30 seconds?<br>MR. CHANDLER: Objection. Vague and ambiguous.<br>A. That's an approximation, an estimate in walking.<br>Q. Okay. It's just an approximation?<br>A. Yes.<br>Q. Okay. You've never timed it?<br>A. No. Not when I did cleanup.<br>Q. Have you -- did you ever time the amount of time that it took for you to put on your gear or wash your hands or walk anywhere in the facility?<br>A. When I went into the fruit room?<br>Q. At any time between 2008 and the time you left in 2010 did you ever actually time the amount of time it took to put on gear, wash hands, walk somewhere or wait in line?<br>A. No, I never timed it with a clock or watch. I just calculated the time period with my head.<br>Q. When you did work as a housekeeper before you clocked in am I correct that you did not put on any gear?<br>A. The only thing I did was to put a hair net on. That's the only thing I would use.<br>Q. Okay. And you did not do anything else other than put a hair net on before clocking in; is that right?<br>A. Yes.<br>***<br>Q. And when you were working as a housekeeper you earlier said you didn't have any gear to put on. So am I correct that you didn't have any gear to take off before you punched out?<br>A. The only thing I wore was the hair net and that was all.<br>Q. So the only thing that you had to take off before punching out was the hair net?<br>A. Yes.<br>Q. And how long did it take to take off the hair net?<br>A. A second. A second, I think. | |
| 7.  Pena testified as follows:<br><br>Q. Okay. In housekeeping you said your first break was how long?<br>A. Ten.<br>Q. Ten minutes? | Pena Dep. at 93:05-:20. |

Gibson, Dunn & Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| A. Yes, the break.<br>Q. And did you get a full ten-minute break without any interruption when you were working in housekeeping?<br>A. When I started at cleanup, yes.<br>Q. And how long was your lunch when you worked in housekeeping?<br>A. Half an hour for lunch.<br>Q. And did you get a full uninterrupted 30 minutes for lunch when you were working in housekeeping?<br>A. Yes. | |
| 8.  Pena testified as follows:<br><br>Q. And what did she tell you about the time to take your break, at the time to take your lunch?<br>A. Well, ten minutes for the break and a half hour for lunch.<br>Q. And what did she tell you about the time that your breaks and lunches should be taken?<br>A. She said it depended on the time I came in. If I started at five o'clock in the morning -- if I started at five hours, then it was two to two and a half hours for break time. And then about 11:00 or 11:30 it was lunch time. That's what she said.<br>Q. Earlier you said 10:30 to 11:00 for lunch?<br>A. 10:30. Yes, 10:00, 10:30.<br>Q. And she told you that you should take your lunch at around 10:30?<br>A. Yes.<br>Q. And how would you determine whether to take your lunch at 10:30 or 11:00 or earlier than 10:30?<br>A. Sometimes I would calculate two and a half hours the first break. And then I would let two or two and a half hours or three go by, and then I would have lunch. | Pena Dep. at 94:04-:25. |
| 9.  Pena testified as follows:<br><br>Q. Okay. And what I'm getting at is that when it came time for you to take a break it was up to you to take the break when you were told to take it, right?<br>A. Yes. Yes, when she would tell me I would go. Because sometimes if it was over the period of time allotted then they would tell me, Carmen, you need to take a | Pena Dep. at 95:12-:23. |

Gibson, Dunn & Crutcher LLP
DEFENDANT TAYLOR FARMS PACIFIC, INC.'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT; CASE NO. 2:13-CV-01282-KJM-AC

| Undisputed Fact | Supporting Evidence |
|---|---|
| break.<br>Q. And why did she tell you to go on break if you had gone over the time she told you to?<br>A. I would say that it was -- if it was past the time -- my break time she would remind me that it was past my break time. | |
| 10. Pena testified as follows:<br><br>Q. And from 2007 when you started working at the  Taylor Farms Pacific facility were you receiving your  paychecks directly from Abel Mendoza?<br>A. Yes.<br>Q. And was that true all the way through to the  time you stopped working at Taylor Farms Pacific's  facility?<br>A. Yes.<br>Q. You did not receive paychecks from Taylor  Farms Pacific, correct?<br>A. No.<br>Q. Is that correct?<br>A. Yes.<br>Q. Sometimes when I ask a question I ask you if  it's correct and so you need to listen to the question  very carefully to make sure that you're answering correctly. Do you understand?<br>A. Yes.<br>Q. So to clarify, you did not receive paychecks  directly from Taylor Farms Pacific, correct?<br>A. Well, I didn't receive directly from the company, but the company was the one that paid me.<br>Q. Abel Mendoza gave you your paychecks, correct?<br>A. Yes.<br>Q. And not Taylor Farms Pacific, correct?<br>A. Yes, right. | Pena Dep. at 26:13-27:5. |
| 11. Adelina Mendoza, testifying on behalf of Abel Mendoza, Inc., testified as follows:<br><br>Q. Was there a process that you're aware of for where anybody from Taylor would physically review the paychecks themselves before they were handed out | Hansen Decl., Ex. B ("Mendoza Dep.") 86:22-87:05. |

Gibson, Dunn &
Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| to the AMI folks?  When I say AMI, I mean those that are being paid by AMI. [objection] THE WITNESS:  Not that I'm aware of. | |
| 12. Adelina Mendoza, testifying on behalf of Abel Mendoza, Inc., testified as follows:<br><br>Q.  Okay.  But whether somebody from Taylor - - well, let me ask you this:  Were the actual copies of the actual checks ever provided to anybody at Taylor, if you know? [objection] THE WITNESS:  No. | Mendoza Dep. at 88:20-89:02. |
| 13. Robin Lopez, testifying on behalf of Taylor Farms Pacific, testified as follows:<br><br>Q. Okay. Do you know how Manpower pays its employees?<br>A. I have no idea how Manpower pays its employees.<br>Q. Do you know how AMI pays its employees?<br>A. I have no idea.<br>Q. Does Taylor Farms have any involvement in how Manpower, Abel Mendoza, or any other labor contractor pay their employees? [objection]<br>Q. That you know of.<br>A. We have no involvement in how they pay their employees.<br>Q. So then I'll ask the question again.  Are you aware of any pay rules in the Kronos system that would affect how any of those entities pay their employees, to your knowledge?<br>A. I don't know how they pay their employees. | Hansen Decl., Ex. C ("Lopez Dep.") at 127:22-128:15. |
| 14. Robin Lopez, testifying on behalf of Taylor Farms Pacific, testified as follows:<br><br>Q.  And do you know what pay system is actually used by any of the labor contracting companies, such as Abel Mendoza, SlingShot, or Manpower, to pay their employees?<br>A.  I don't – [objection]  I don't know what system they use.<br>***<br>Q.  Do you even know if they even rely upon | Lopez Dep. at 133:02-:16. |

Gibson, Dunn & Crutcher LLP

8
DEFENDANT TAYLOR FARMS PACIFIC, INC.'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT; CASE NO. 2:13-cv-01282-KJM-AC

| Undisputed Fact | Supporting Evidence |
|---|---|
| any of the pay rules that are set up in the Kronos system? <br> A. I don't know whether they rely on them. | |
| 15. Robin Lopez, testifying on behalf of Taylor Farms Pacific, testified as follows: <br><br> Q. And so Taylor Farms Pacific records the time worked by workers supplied by AMI and by SlingShot? <br> [objection] <br> A. We record the hours worked by contractors. <br> Q. Does - - just to clarify.  Does Taylor Farms Pacific require that Abel Mendoza, or any other temp agency, for that matter, use those records for anything other than invoicing Taylor Farms? <br> [objection] <br> A. We require AMI or other contractors with those records to input them. <br> Q. Okay.  Do you require that they use those records to keep track of the time their employees worked and to pay their employees? <br> A. I don't know how they pay their employees? <br> Q. Do you know if they keep additional systems or have separate systems for tracking the time worked for purposes of their paying their employees? <br> A. I don't know how they pay their employees. <br> Q. Do you know if they keep additional systems or have separate systems for tracking the time worked for purposes of their paying their employees? <br> [objection] <br> A. I don't know if they have additional timekeeping. <br> Q. Is there anything that Taylor Farms Pacific does to prevent any of the labor contracting companies from paying their employees for more than what is reported to them on time sheets provided by Taylor Farms Pacific? <br> A. Can you say that again? <br> Q. Yeah.  [Question read back]. <br> A. No.  There's nothing to do with that. | Lopez Dep. 134:07-135:20. |
| 16. Pena testified as follows: <br><br> Q. Did you ever talk to Abel Mendoza about the  paychecks that you received from | Pena Dep. at 30:23-31:02. |

9

Gibson, Dunn & Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| them like Exhibit 2?<br>MR. CHANDLER: Objection. Vague and ambiguous.<br>THE WITNESS: No. | |
| 17. Pena testified as follows:<br><br>Q. And was there ever a time where you looked at the hours and decided that they did not accurately reflect the time that you worked?<br>MR. CHANDLER: Okay. Vague and ambiguous as to the phrase worked.<br>THE WITNESS: Sometimes.<br>BY MR. CRIPPS: Q. Did you keep track of the hours that you worked separately?<br>MR. CHANDLER: Same objection.<br>THE WITNESS: Not always. Sometimes I had it here.<br>BY MR. CRIPPS: Q. Your head?<br>A. Yes.<br>***<br>Q. And how often did you determine that the number of hours on your pay stub from Abel Mendoza did not match with the number of hours that you thought you had work?<br>MR. CHANDLER: I object to the question. It's vague and ambiguous as to the use of the phrase "worked."<br>THE WITNESS: About once or twice.<br>BY MR. CRIPPS: Q. And how far off did you think it was?<br>A. I don't recall. No.<br>Q. Was it a big difference or a small difference, or you don't know?<br>A. Small.<br>Q. Did you talk to anybody about that?<br>A. No.<br>Q. And why not?<br>A. I didn't pay attention to it. | Pena Dep. at 31:20-33:5. |
| 18. Pena testified as follows:<br><br>Q. Earlier we talked about your leaving in April of 2010. Why did you leave Taylor Farms Pacific?<br>A. What happened is they called me from | Pena Dep. at 168:25-169:10. |

DEFENDANT TAYLOR FARMS PACIFIC, INC.'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT; CASE NO. 2:13-CV-01282-KJM-AC

Gibson, Dunn & Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| Abel Mendoza that at that moment, at that time, there was no work for me.<br>Q. Abel Mendoza called you at your home to tell you that?<br>A. The secretary.<br>Q. The secretary from Abel Mendoza called you at your home to tell you that?<br>A. Yes. | |
| 19. Pena testified as follows:<br><br>Q. And did you go to Abel Mendoza, then, to pick up your final check?<br>A. No.<br>Q. Did you send Abel Mendoza a notice as to where your final check should be sent?<br>A. No. They never told me anything about that.<br>Q. Okay. How did you get your final check?<br>A. Well, I went to pick it up on a Friday when they paid.<br>Q. And when did they call you?<br>A. They didn't call me. I went on my own.<br>Q. Now, earlier you said they called you at home. What day of the week did they call you at home?<br>A. I don't recall the day, but it was on the 7th that I didn't work any more. It was during the week they called me, but I don't remember the day exactly.<br>Q. And how many days passed from the time you got that phone call until the time that you went to pick up the check?<br>A. I think two days. | Pena Dep. at 169:11-170:5. |
| 20. Pena testified as follows:<br><br>Q. Did Abel Mendoza allow you to pick up your checks there at the Taylor Farms facility or did you have to go somewhere else?<br>A. I had to pick them up at Abel Mendoza's offices.<br>Q. And that's where you went to pick up your final check?<br>A. Yes. | Pena Dep. at 171:2-171:9. |

Gibson, Dunn & Crutcher LLP

DEFENDANT TAYLOR FARMS PACIFIC, INC.'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT; CASE NO. 2:13-CV-01282-KJM-AC

| Undisputed Fact | Supporting Evidence |
|---|---|
| 21. Pena testified as follows:<br><br>Q. Was there anybody at Taylor Farms Pacific that you talked to or communicated with about your final check or was that all through Abel Mendoza's secretary?<br>A. Everything through the secretary – Abel Mendoza's secretary. | Pena Dep. at 171:15-19. |
| 22. Pena testified as follows:<br><br>Q. Ms. Pena, when you were working at the Taylor Farms Pacific facilities between 2006 and 2010 did you ever have any interactions or discussions with the Human Resources Department at Taylor Farms Pacific?<br>MR. CHANDLER: Objection. Compound. Speculation. Vague.<br>THE WITNESS: No.<br>BY MR. CRIPPS:<br>Q. What about after you left Taylor Farms?<br>MR. CHANDLER: Same objections.<br>THE WITNESS: No. | Pena Dep. at 168:13-23. |
| 23. On May 16, 2013, Pena served an amended response to Form Interrogatory 210.2, which asks the responding party to "State the total amount of income, benefits, or earning capacity you have lost to date and how the amount was calculated."  Pena's response was, in part:<br><br>Plaintiff was not paid all wages due and owing to her in her final pay check as a result of Defendant having failed to report all wages due and owing to AMI. Under California law, the penalty calls for a maximum of 30 days pay. Assuming Answering Plaintiff worked an average of 9 hours per day at $8 per hours = $72 per day x 30 days = **$2,160.** | Hansen Decl., Ex. D at 3 (Plaintiff Maria del Carmen Pena's Amended Responses to Defendant Taylor Farms Pacific, Inc., Form Interrogatory – Employment Law, Set One, No. 210.2). |
| 24. On May 16, 2013, Pena served an amended response to Form Interrogatory 210.2, which asks the responding party to "State the total amount of income, benefits, or earning capacity you have lost to date and how the amount was calculated."  Pena's | Hansen Decl., Ex. D at 3. |

Gibson, Dunn & Crutcher LLP

DEFENDANT TAYLOR FARMS PACIFIC, INC.'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT; CASE NO. 2:13-CV-01282-KJM-AC

| Undisputed Fact | Supporting Evidence |
|---|---|
| response was, in part:<br><br>Plaintiff was employed for 561 days, assuming that she was paid during her first week of work and that she started on a Monday and was paid on the first Friday, plaintiff was thus employed for 57 pay periods. Not a single one of Answering Plaintiffs pay stubs reflects an accurate accounting of wages due and owing. Though Answering Plaintiffs pay checks were not issued by Defendant, the failure of Answering Plaintiffs pay checks to include all hours works stems from the failure of Defendant to notify and pay AMI of meal and rest break premiums owed to the jont employees of Defendant and AMI. Under California law, the penalty for the first inaccurate pay stub is $50 dollars with $100 dollars owed for each subsequent violation, up to $4000 dollars. Answering Plaintiff is owed the maximum amount available under law, **$4000.** | |
| 25. On March 13, 2013, Pena served discovery responses in which, asked to identify any "written rules, guidelines, policies, or procedures established by" Taylor Farms Pacific, she did not identify any policy prohibiting her from leaving company grounds during meal breaks. | Hansen Decl., Ex. E at 3-4 (Plaintiff Maria del Carmen Penas [sic] Responses to Defendant Taylor Farms Pacific, Inc. Form Interrogatories – Employment Law, Set One) (Form Interrogatory 200.4). |
| 26. On June 13, 2014, Plaintiffs served their Third Supplemental Disclosure Statement Pursuant to Rule 26(e).  Plaintiffs do not calculate any actual damages arising from their wage statement claim. | Hansen Decl., Ex. F. |
| 27. Pena does not claim to have suffered any damages arising from Labor Code sections 221-223 and 401-410 | Hansen Decl. Exs. D & F. |
| **Consuelo Hernandez** | |
| 28. From June 2008 to March 2009, Consuelo Hernandez was an employee of Taylor Farms Pacific. | Hansen Decl., Ex. G. (hereinafter cited as "Hernandez Dep.") at 32:19-24. |
| 29. Hernandez testified as follows:<br><br>Q. And it's your testimony that you had all of that equipment on every single day before you punched in?<br>A. Yes. | Hernandez Dep. at 52:06-:09. |

Gibson, Dunn &<br>Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| 30. Hernandez testified as follows:<br><br>Q. How long did it take you to dip your hands?<br>A. Well, I didn't check the time either. We would dip them in and then pull them out and then go to work.<br>Q. How long would that take?<br>A. I never checked. I never took notice. I don't know.<br>Q. Would it take more than five seconds?<br>A. I don't know.<br>Q. Would it take more than 15 seconds?<br>A. I don't know.<br>Q. Would it take more than 30 seconds?<br>A. I don't know.<br>Q. Can you show us here on the video what it is you did to dip your hand and do it at the same speed that you would do it while getting ready to work?<br>A. Dip our hands. We would get to the work area, and we would dip our hands and we would move them. And we would pull them out and go to our work area.<br>Q. And the movement that you just made with your hands, that's about how long it would take you to dip your hands?<br>A. I don't know. I don't know.<br>Q. Do you know how long it took you to put on your smock?<br>A. I don't know that either. I didn't take notice.<br>Q. What about your gloves?<br>A. It's because I never took time. I knew that I needed to be in a work area by a certain time so I never took notice how long it took to put on my equipment.<br>Q. So if I asked you to estimate how much time it took to put on any of your equipment could you give me an estimate?<br>A. Well, I don't know. I honestly couldn't say if it was five or four or three. I don't know.<br>Q. Do you know how long or can you estimate how long it took for you to take off your equipment?<br>A. Neither. I don't know that either. No, I never -- I never took notice. | Hernandez Dep. at 80:03-81:17. |
| 31. In response to California Judicial Form Interrogatories—Employment Law, Form Interrogatory 210.2, which requests as follows: "State the total amount of income, | Hansen Decl., Ex. H (Plaintiff Consuelo Hernandez' Amended Response to Defendant Taylor Farms Pacific, Inc. Form Interrogatories – Employment Law, Set One, No. 210.2). |

Gibson, Dunn & Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| benefits, or earning capacity you have lost to date and how the amount was calculated," Hernandez served a verified amended response on May 18, 2013, which not include any claim for damages arising from any alleged off-the-clock work. | |
| 32. While an employee of Taylor Farms Pacific, Taylor Farms Pacific issued wage statements to Hernandez with her weekly paychecks. | Hernandez Dep. at 163:24-164:05. |
| 33. Hernandez testified as follows:<br><br>Q. Ms. Hernandez, I've marked as Exhibit 10 a copy of one of the pay stubs that you produced to us  through your attorneys in this lawsuit. Do you  recognize this?<br>A. Yes.<br>Q. And this is the format of the pay stub that you would review every week when you got your check?<br>A. I think so. I don't remember.<br>Q. Okay. And you would review this type of pay stub here as Exhibit 10 to make sure that your hours  were correct for the week; is that right?<br>A. Yes.<br>Q. Okay. And how would you go about doing that?<br>A. Well, I would count. I knew how many hours I worked for a week, and I would check my stub to see the  hours were correct.<br>Q. Did you just know in your head, or did you  write down the total hours that you had worked?<br>A. No, I would write them down.<br>Q. Where did you write those down?<br>A. On a binder that I had at home.<br>Q. And do you still have that binder?<br>A. No, I don't think so.<br>Q. When did you get rid of that binder?<br>A. I don't remember. I didn't think I had this paper either, but I found it.<br>Q. Where did the binder go?<br>A. I imagine into the garbage.<br>Q. Was that before or after the lawsuit was filed? | Hernandez Dep. at 165:17-167:22. |

Gibson, Dunn & Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| A. As I was looking at the hours for the week, for example, if I worked 40 hours this week or 30, and I would see that they were correct according to the pay stub, sometimes I would tear up the paper where I would write down my hours. So -- so I'm sure that I don't have any paper in reference to my work hours.<br>Q. Okay. But did you throw away all those papers before this lawsuit was filed?<br>MR. DOWNEY: Objection. Assumes facts not in evidence. She may answer.<br>THE WITNESS: I think so.<br>BY MR. CRIPPS:<br>Q. Okay. And was there ever a week when you looked at the number of hours that you had written down in your notebook and compared them to your paycheck and you determined that you weren't being paid for certain hours?<br>A. No, I don't think so.<br>Q. And how is it that you went about writing down your time that you worked over the course of the day?<br>A. Because when I was working, for example, if I worked eight hours today or seven and a half, I would go home and I would write down my time. | |
| 34. Hernandez testified as follows:<br><br>Q. So when you checked your pay stubs did you use a calculator to do that?<br>A. No, I don't think so. I don't remember.<br>Q. Why did you not use a calculator to check?<br>A. Because I could do it without a calculator.<br>Q. Oh. You're good at math?<br>A. It's not difficult to do the math.<br>***<br>Q. [W]as there anything that you found confusing about your pay stub?<br>MR. DOWNEY: Objection. Asked and answered. You may answer.<br>A. No. I didn't see nothing confusing. | Hernandez Dep. at 172:08-:14, 177:11-:16 |

Gibson, Dunn & Crutcher LLP
DEFENDANT TAYLOR FARMS PACIFIC, INC.'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT; CASE NO. 2:13-CV-01282-KJM-AC

| Undisputed Fact | Supporting Evidence |
|---|---|
| 35. Hernandez testified as follows:<br><br>Q. Ms. Hernandez, before we took a break we were looking at Exhibit 10 here, and I was asking how you went about calculating the total hours that you were paid for on your pay stubs. So you pointed out that your regular hours at least here in Exhibit 10 is 40; is that right?<br>A. Yes.<br>Q. And you said you were paid at what rate?<br>A. The check?<br>Q. You were paid at eight dollars an hour; is that right?<br>A. Oh, yes, yes.<br>Q. So up at the top it says "Regular 4O." Up at the very top. Do you see that?<br>A. Yes.<br>Q. Okay. And those regular hours were paid at eight dollars an hour?<br>A. Yes.<br>Q. And you understood that, right?<br>A. Yes.<br>***<br>Q. Okay. And you knew what overtime was, right?<br>A. Yes.<br>Q. Okay. And you knew that overtime is paid at time and a half of your regular rate, right?<br>A. Yes.<br>Q. So, in other words, $12 an hour, right?<br>A. Yes.<br>Q. And you understood that, right?<br>A. Yes.<br>***<br>Q. Okay. So in order to determine the total number of hours that you had worked for the week or at least the total number of hours that you were paid for during the week where would you look on the paycheck?<br>A. To determine the hours I worked, to know the hours I worked?<br>Q. Yeah, on the paycheck.<br>A. Well, not the check. I always saw the stub.<br>Q. Okay. The stub is Exhibit 10?<br>A. Yes.<br>Q. Okay. My mistake. On the pay stub where would you look to see the total hours that you were paid for for the week?<br>A. Where it says "Regular Hours" and | Hernandez Dep. at 170:05-:24, 171:05-:13, 175:19-177:07. |

DEFENDANT TAYLOR FARMS PACIFIC, INC.'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT; CASE NO. 2:13-cv-01282-KJM-AC

Gibson, Dunn & Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| "Overtime," where I would see that.<br>Q. So you understood that it would be, for this week, 44.28 hours total?<br>A. Yes.<br>Q. And this is for the week ending January 17th, 2009; is that right?<br>A. Yes.<br>Q. You were paid for seven days at a time?<br>A. We were paid -- I didn't understand the question.<br>Q. You were paid on a weekly basis?<br>A. Yes.<br>Q. Seven days at a time?<br>A. Seven days at a time?<br>Q. Yes. A week is seven days, right?<br>A. Yes, but we only worked five days a week.<br>Q. Oh, okay. But for any week during that seven-day period -- I'm sorry -- for any time during a seven-day period you knew you were being paid on a weekly basis?<br>A. Yes.<br>Q. So for this example here, Exhibit 10, you knew you were being paid for time worked between January 11th and January 17th, 2009?<br>A. Yes, it was a week. | |
| 36. Hernandez testified as follows:<br><br>Q. So let's take a look at Exhibit 6, and maybe something about Exhibit 6 would have refreshed your memory.  Having reviewed Exhibit 6 outside with your attorney, it says here that the last day that you worked at Taylor Farms was March 15th, 2009; is that right?<br>A. That's correct.<br>Q. And that was, in fact, your last day of work at Taylor Farms?<br>A. Yes.<br>Q. Okay. And then in Exhibit 6 it says that you didn't call in and didn't show up for work three workdays in a row.  Is that what happened?<br>A. Yes. That is, I didn't show up to work those days, but I did call.<br>Q. And the reason you didn't show up is because you had to leave for Mexico to be with your father?<br>A. Yes. | Hernandez Dep. at 152:04-:22, Exhibit 6. |

Gibson, Dunn & Crutcher LLP

18

| Undisputed Fact | Supporting Evidence |
|---|---|
| 37. Hernandez was in Mexico when Taylor Farms Pacific terminated her in March 2009. | 7AC ¶ 25. |
| 38. Hernandez testified as follows:<br><br>Q. Did you ever send in a written note to Taylor Farms asking them to send a final paycheck to you?<br>A. No. | Hernandez Dep. at 156:04-:06. |
| 39. Hernandez testified as follows:<br><br>Q. When you returned from Mexico that was about a week and a half after March 15, 2009; is that right?<br>A. Approximately. | Hernandez Dep. at 155:09-:11 |
| 40. Hernandez testified as follows:<br><br>Q. And at the time you showed up at the facility did she give you a final paycheck sometime in the end of March of 2009?<br>A. Yes. | Hernandez Dep. at 156:11-:14. |
| 41. Hernandez testified as follows:<br><br>Q. So in October of 2011 you went back to the agency directly to look for another job with Taylor Farms?<br>A. Different agency. I didn't go directly to Taylor Farms. I went to the agency, and they told me that the only applications they were handing out were for Taylor Farms.<br>Q. And what agency was that?<br>A. It's called Manpower. And it's on -- here off March Lane. But it's on the other side of the overpass. | Hernandez Dep. at 103:13-:23. |
| 42. Hernandez testified as follows:<br><br>Q. It was a different training than you got when  you were a Taylor Farms employee back in 2008?<br>A. Yes, I think so because they only showed us  the equipment from work -- well, it's because the first  orientation lasted approximately seven hours, and this  one | Hernandez Dep. at 105:06-106:12 |

Gibson, Dunn & Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| was about an hour and a half or two. I don't  remember exactly.<br><br>Q. Who gave the training?<br><br>A. I don't remember.<br><br>Q. Did you get any documents or materials at the  training?<br><br>A. I don't remember. I don't remember. Material, no. What are you referring to as material?<br><br>Q. Documents, papers.<br><br>A. I don't remember. On behalf of Taylor Farms I  think not. I think it was on behalf of the agency.  Because I was not to deal at all with Taylor Farms. It  was all through the agency.<br><br>Q. And how did you know that you were not supposed to deal at all with Taylor Farms?<br><br>A. Because I remember when one of the young  ladies interviewed me at the agency even the agency was  going to pay me. Everything was going to be through  the agency and for the agency.<br><br>Q. And you understood that you were going to be paid for your work at the Taylor Farms facility by the  agency?<br><br>A. The check was sent through the mail. So honestly, no. And the check had the logo of the agency.<br><br>Q. So for that work you were paid by the agency?<br><br>A. Yes. | |
| 43. In October 2011, Hernandez began her single shift at Taylor Farms Pacific at 9:00 a.m. and left the Valpico plant at 11:00 p.m. | Hernandez Dep. at 111:15-:16, 120:22-121:03. |
| 44. Hernandez testified as follows:<br><br>Q.  And how long did it then take for you to get to the hygiene or equipment room?<br><br>A. I don't know.  I don't remember.<br><br>Q. How long did it take for you to put on your gear before going to the production floor?<br><br>A. I don't know.<br><br>Q. Did anybody say anything to you about when you could punch in at Valpico or | Hernandez Dep. at 113:03-:12 |

Gibson, Dunn & Crutcher LLP

DEFENDANT TAYLOR FARMS PACIFIC, INC.'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT; CASE NO. 2:13-CV-01282-KJM-AC

| Undisputed Fact | Supporting Evidence |
|---|---|
| when you could punch out at Valpico? <br> A.  I don't remember that either. | |
| 45.  Hernandez has stated that, "[w]ith regard to her second final pay check, Mrs. Hernandez had resigned[.]" | 7AC ¶ 25. |
| 46.  Hernandez testified as follows: <br><br> Q.  Were you hired only for one day, or did you  leave for some reason? <br> A.  Yes, I left because I'm injured, this hand, and that day I worked 14 hours. And my hand was very  swollen. And I got up the next day, the same, we were  going to start at seven in the morning. I got up early  because it takes me a while to get ready. So I got up  at about 5:00 or 5:30. And I couldn't put up with it.  My hand was hurting a lot.  I called Taylor Farms to see if someone would  answer so I could let them know that I was not going to  show up. And I even took pictures of my hand so that I  could present them because I didn't want to miss.  I  didn't want to lose my job.  And at that time no one answered, but I called  later and a person answered and he said that I could no  longer show up because I didn't show up at that moment  when they needed me and that I could no longer go. | Hernandez Dep. at 106:18-107:10. |
| 47.  Hernandez testified as follows: <br><br> Q.  You don't know whether the person you talked  to by phone was a Manpower or Taylor Farms employee,  right? <br> A.  No, I don't know that either. | Hernandez Dep. at 109:10-:13. |
| 48.  Hernandez testified as follows: <br><br> Q.  Ms. Hernandez, just a very few short questions  for you about the check you received from Manpower for the one day of work at the Valpico facility in 2011, okay? <br> A.  Yes. <br> Q.  Did you go in personally to Manpower to | Hernandez Dep. 232:02-233:22. |

Gibson, Dunn &
Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| get  your check?<br>A. No.<br>Q. Did you go into Taylor Farms to get your check?<br>A. Neither, no.<br>Q. Did you send Taylor Farms any kind of notice  telling them where the final payment should be sent?<br>A. No, all this was by the agency.<br>Q. Okay. Did you send Manpower a notice as to  where the final payment should be sent?<br>A. When I went to apply for employment they asked  for all my data, and they told me that Manpower would  take care of paying me and sending me my check to my  address.<br>Q. For the final check specifically did you send  Manpower a written notice as to where that final check  should be sent?<br>A. No, I didn't send any notification. | |
| 49. Hernandez testified as follows:<br><br>Q. When you showed up at the Valpico facility to  work did you go in through the door that leads into the  cafeteria?<br>A. Yes. We entered there. I entered there.<br>Q. Where were the punch clocks located?<br>A. I didn't punch in that day. They gave me the  name of a person whom I had to arrive to, but I don't  remember the name. It was a woman. I don't know if she noted my schedule because I don't remember punching  in.<br>Q. And so how was your time recorded that day?<br>A. I honestly don't know.<br>Q. You received a paycheck from Manpower. Do you  have any idea how the time was calculated to pay you  for that work?<br>MR. DOWNEY: Objection. Foundation. You can  answer.<br>THE WITNESS: I don't know. Maybe through the  supervisor. I arrived at the time I was told, and I  stayed until the | Hernandez Dep. at 110:17-111:11. |

DEFENDANT TAYLOR FARMS PACIFIC, INC.'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT; CASE NO. 2:13-CV-01282-KJM-AC

Gibson, Dunn &
Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| supervisor needed me. | |
| 50. Hernandez testified as follows:<br><br>Q. What was your hourly rate when you worked at the MacArthur facility?<br>A. Eight dollars.<br>Q. For the entire period?<br>A. During the nine months?<br>Q. Yeah, eight dollars an hour for the entire nine months?<br>A. Yes.<br>Q. And what was your hourly rate when you worked through Manpower?<br>A. I think it was the same. I'm not sure. | Hernandez Dep. at 121:08-:18. |
| 51. Hernandez testified as follows:<br><br>Q. Let's -- just to button up something on Valpico. You said you arrived at 9:00 a.m. the day you worked at Valpico. What time did you leave the facility?<br>A. At 11:00 at night.<br>Q. Right at 11:00 on the dot?<br>A. Yes.<br>Q. And do you recall how much you were paid for that day?<br>A. I don't remember exactly. I know it was over $200, but I don't remember. | Hernandez Dep. at 120:22-121:07. |
| 52. Hernandez's amended response to Form Interrogatory 210.2 states in part:<br><br>Plaintiff was employed for 134 days, assuming that she was paid during her first week of work and that she started on a Monday and was paid on the first Friday, plaintiff was thus employed for 19 pay periods. Not a single on [sic] of Answering Plaintiffs [sic] pay stubs reflects an accurate accounting of wages due and owing (amongst other errors in the pay stubs for which defendant has no legal defenses). Under California law, the penalty for the first inaccurate pay stub is $50 dollars with $100 dollars owed for each subsequent violation, up to $4000 dollars. Thus, the amount owed for the first violation is $50 dollars and $100 dollars per each of the subsequent 18 violations = **$1,850**. | Hansen Decl., Ex. H, at 3. |

Gibson, Dunn &
Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| 53. Hernandez does not claim to have suffered any damages arising from Labor Code sections 221-223 and 401-410. | Hansen Decl., Exs. F & H. |
| **Leticia Suarez** | |
| 54. Suarez testified as follows:<br><br>Q. Ms. Suarez, you started working in the prepared salads room at Taylor Farms Pacific on October 26th, 2009, right?<br>A. Correct.<br>Q. And you worked in the prepared salads room all the way through the end of your employment on July 20th, 2012, right?<br>A. Correct. | Hansen Decl., Ex. I (hereinafter "Suarez Dep. I") at 69:04-:11. |
| 55. Suarez testified as follows:<br><br>Q. Ms. Suarez, earlier you talked about the time that you worked on the production crew in the prepared salads room. And that started in October of 2009; is that right?<br>A. Correct.<br>Q. And then you received a promotion shortly after that in 2010; is that right?<br>MR. DOWNEY: Objection; vague.<br>A. Correct.<br>Q. And you became a documentation tech at that time; is that right?<br>A. Correct. | Hansen Decl., Ex. J (hereinafter "Suarez Dep. II") at 215:15-216:01. |
| 56. Suarez testified as follows:<br><br>Q. And once you would go on break or lunch, as a documentation tech, you would go back into the hygiene room to take off your gear, right?<br>A. Correct.<br>Q. And for a break, not a lunch, where would you go to take your break?<br>A. The same place, the cafeteria.<br>Q. And when you were in the cafeteria, you knew you had ten minutes for your break, right?<br>A. Correct.<br>Q. And then, once the ten minutes ended, you were supposed to walk back in, put your gear back on to get back to the line, right? | Suarez Dep. I at 76:12-77:03. |

Gibson, Dunn & Crutcher LLP

DEFENDANT TAYLOR FARMS PACIFIC, INC.'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT; CASE NO. 2:13-cv-01282-KJM-AC

| Undisputed Fact | Supporting Evidence |
|---|---|
| MR. DOWNEY: Objection. Assumes facts not in evidence. Mischaracterizes testimony. She may answer.<br>A. Correct. Right. | |
| 57. Suarez testified as follows:<br><br>Q. And for lunch, you would come out of the salad room into the hygiene room, right?<br>A. Correct.<br>Q. To take off your gear, right?<br>A. Correct. Right.<br>Q. Then you would walk over to the punch clock, right?<br>A. Correct.<br>Q. And would you punch out for lunch?<br>A. That's right.<br>Q. And you would punch back in for lunch, right, when you were done?<br>A. Correct.<br>Q. And you knew you had between 30 and 35 minutes to be punched out, correct?<br>A. Correct.<br>***<br>Q. How did you know when it was time to go back from lunch or break?<br>A. The lunch, because you check your own watch or telephone or a clock in the cafeteria. And the break, we tried to keep time on our own, but the crew leader would announce it.<br>Q. So you would either look at your watch at lunch to make sure that 30 to 35 minutes had passed before punching in?<br>A. Oh, we consulted the clock on the wall, because watches weren't allowed.<br>Q. Fair enough. But you would look at the clock on the wall to determine that?<br>A. Yes. | Suarez Dep. I at 77:05-:20, 79:08-:22. |
| 58. Suarez testified as follows:<br><br>Q. Okay. Earlier you talked about lunch boxes that some people would bring to the facility. Do you recall that?<br>A. Yes.<br>Q. Some people used the taco cart instead; right?<br>A. That's correct. | Suarez Dep. II at 220:18-:23. |

Gibson, Dunn & Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| 59. Suarez testified as follows:<br><br>Q. And did you review that check stub every week?<br>A. Honestly, a lot of times, no.<br>Q. Any reason why not?<br>A. No. I started checking them when some people that I worked with were making some comments about hours that were missing on their checks, and so at that point I started checking them more frequently.<br>Q. And when was that?<br>A. Exact dates, I don't know.<br>Q. Can you give me an estimate?<br>A. Honestly, no.<br>Q. Okay. And did you review your own pay stub to see if there might be hours missing?<br>A. Sometimes, yes.<br>Q. And was there ever anything that you determined was inaccurate about the pay stub?<br>A. Yes. I remember there were times -- sometimes I would look, and I would notice that there were hours missing that I had worked.<br>Q. When?<br>A. No, I don't remember the exact -- exact dates. I just remember them in the control room telling me that it was the punch card's fault.<br>Q. How many times did this happen?<br>A. I don't know. I don't remember.<br>Q. Can you estimate?<br>A. No.<br>Q. If you don't remember the exact dates, can you give me an estimate of the dates when this occurred?<br>A. No.<br>Q. Can you give me an estimate of how many times this occurred?<br>A. It could be between three, four times.<br>Q. And on those three to four times, who did you talk to in central control?<br>A. Jesus Fernandez.<br>Q. Anyone else?<br>A. No.<br>Q. And what did Jesus Fernandez tell you about the punch clocks on those three to four occasions?<br>A. I remember on one of these occasions, he said he had registered the -- what I had punched in, and there was a time that it | Suarez Dep. II at 125:11-128:07. |

Gibson, Dunn & Crutcher LLP

DEFENDANT TAYLOR FARMS PACIFIC, INC.'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT; CASE NO. 2:13-cv-01282-KJM-AC

| Undisputed Fact | Supporting Evidence |
|---|---|
| was missing when I punched in before lunch.<br>Q. Meaning that you punched back in coming back from lunch, or going to lunch?<br>A. Coming back from lunch.<br>Q. And so what did Jesus Fernandez tell you about what would happen if the machine didn't register you properly coming back from lunch?<br>A. What was going to happen?<br>Q. Yes.<br>A That they were going to take -- that they were going to take off a point, that I had to sign a piece of paper that says they were going to take off a point for missing punching in, and that if I didn't sign that paper, they couldn't pay me for the hours that were missing on my check.<br>Q. So did you sign the paper?<br>A. Yes.<br>Q. And then they paid you for the hours that were missing on your check?<br>A. Yes.<br>Q. And did you then -- strike that. Do you remember two of the other two to three times that you mentioned that you may have talked to Jesus Fernandez about your pay stub?<br>A. What the exact problem was, no. But normally, it was the same type of situation.<br>Q. And it was handled the same way?<br>A. Yes.<br>Q. So you would sign a piece of paper for a missing punch, and then they would pay you for that time?<br>A. Yes. | |
| 60. Suarez testified as follows:<br><br>Q. Okay. Other than what you've described, was there anything inaccurate or confusing about the pay stubs that you received?<br>MR. DOWNEY: Objection; vague.<br>A. Honestly, I don't remember. | Suarez Dep. II at 129:04-:08. |
| 61. Suarez testified as follows:<br><br>Q. How did you get your final paycheck?<br>A. A check that they gave me there in the company. | Suarez Dep. II at 140:02-:17. |

Gibson, Dunn & Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| Q. On the day your employment ended?<br>A. Yes.<br>Q. And did you look over the check and the pay stub with it?<br>A. No.<br>Q. And have you looked at it since?<br>A. Yes.<br>Q. Okay. And was there anything inaccurate about that paycheck --<br>MR. DOWNEY: Objection --<br>Q. -- that you -- that you can recall?<br>MR. DOWNEY: Objection; foundation.<br>A. Not that I remember. | |
| 62. Suarez provided interrogatory responses on March 8, 2013, in which, asked to identify "any written rules, guidelines, or procedures established by" Taylor Farms Pacific, she did not identify any policies prohibiting employees from leaving the premises during meal breaks. | Hansen Decl., Ex. K (Plaintiff Leticia Suarez' Responses to Defendant Taylor Farms Pacific, Inc. Form Interrogatories – Employment Law, Set One, Rog. 200.4). |
| 63. Suarez does not claim to have suffered any damages arising from Labor Code sections 221-223 and 401-410. | Hansen Decl., Ex. L (Plaintiff Leticia Suarez' Amended Responses to Defendant Taylor Farms Pacific, Inc. Form Interrogator [sic] – Employment Law, Set One, No. 210.2); Hansen Decl. Ex. F. |
| **Rosemary Dail** | |
| 64. Dail testified as follows:<br><br>Q. And when did you start working at Taylor Farms Pacific?<br>A. In 2009.<br>Q. And when did you stop working at Taylor Farms Pacific?<br>A. 2010.<br>Q. Do you know what months you -- what month you started in 2009?<br>A. I think -- I think it was June 2009.<br>Q. And until when in 2010 did you work there?<br>A. Somewhere September of 2010. | Hansen Decl., Ex. M (hereinafter cited as "Dail Dep.") at 10:07-:17. |
| 65. Dail testified as follows:<br><br>Q. And when you came in in the morning, you – you walked through the cafeteria, correct?<br>A. Yes.<br>Q. You punched in?<br>A. Yes.<br>Q. And then you went to put on that | Dail Dep. at 72:12-73:05, 76:17-77:04. |

Gibson, Dunn &
Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| equipment; correct?<br>A.  Yes.<br>Q.  And what equipment did you put on?<br>MR. CHANDLER: Objection. It's overly broad, vague and ambiguous.<br>THE WITNESS: Before you walked in the door to --<br>MR. CHANDLER: You describe it to her.<br>THE WITNESS: Before you walked in the door to the packing warehouse, you had to put on a hair net to start with.  From there, you proceeded to clock in.  From there you walked around the corner and went into the equipment room, and you put on a smock.  You would put on sleeve covers.  You would put on another set of gloves[.]<br>***<br>Q.  So you need to – you need to go back to the production line after lunch; correct?<br>A.  Right.  Same thing.<br>Q.  So same thing.  You would punch in, and you would go and put on all your gear on in the hygiene room?<br>A.  Yes.<br>Q.  Okay.  And then, how about when – when you're leaving to go into lunch?  Do you go into the hygiene room, take off the gear, and then punch out?<br>A.  Yes.<br>Q.  And then after punching out, you then go and take your lunch; correct?<br>A.  Yes. | |
| 66. Dail testified as follows:<br><br>Q. How long did it take you to put the hair net on?<br>MR. CHANDLER: Objection. It's vague and ambiguous.<br>A. Not long. I don't have much hair.<br>Q. So just -- I mean, like about a second?<br>MR. CHANDLER: Same objection.<br>A. Yes. | Dail Dep. at 74:10-:16. |
| 67. Dail testified as follows:<br><br>Q. Okay. When you're putting the -- the protective equipment on, how long does it take you to put on?<br>MR. CHANDLER: Objection. It's overly broad. It's vague. It's ambiguous.<br>A. It depends. | Dail Dep. at 94:05-:22. |

Gibson, Dunn &
Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| Q. And what does it depend on?<br>MR. CHANDLER: Same objections.<br>A. It depends on where you're at when you go in. If you're one of the first people to go in, it could take you a couple of minutes. And if you're one of the last people to go in, it could take you five minutes, maybe more.<br>Q. And all of that time, you're on the clock; correct?<br>MR. CHANDLER: Objection. It's overly broad, vague, ambiguous. It's been asked and answered and misstates testimony.<br>A. I believe so, yes. | |
| 68. Dail testified as follows:<br><br>Q. And did you ever attend any -- any meetings before you clocked in?<br>MR. CHANDLER: Objection; vague -- objection. It's vague and ambiguous. But go ahead.<br>A. I don't think so, but I'm not sure. | Dail Dep. at 75:03-:08. |
| 69. Dail testified as follows:<br><br>Q. Did you ever sanitize equipment?<br>A. No.<br>Q. Before or after a shift, you've never sanitized equipment?<br>A. No.<br>Q. Did you ever take equipment home with you to sanitize?<br>A. No. | Dail Dep. at 95:19-96:01. |
| 70. Dail testified as follows:<br><br>Q. And the rest breaks that you were -- that you would take, how long were the rest breaks?<br>A. They were supposed to be ten minutes; but as well as the meal break, you had to be back at the line in ten minutes.<br>Q. You had to be back within ten minutes of leaving the line? Would -- is that your testimony?<br>MR. CHANDLER: I'll object because it's vague and ambiguous. To the extent you're able to answer her question, go ahead. | Dail Dep. at 81:08-82:01. |

Gibson, Dunn & Crutcher LLP

DEFENDANT TAYLOR FARMS PACIFIC, INC.'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT; CASE NO. 2:13-CV-01282-KJM-AC

| Undisputed Fact | Supporting Evidence |
|---|---|
| A. Roughly. I want to say that it is a window of 15 minutes, but you have to count the time from you left the line to go in the change-out room, take off your equipment, go to your break. We would -- we would go back in roughly a couple of minutes early so that we could get our equipment back on, because there was a – sometimes a line to get the -- the equipment that you needed and get back to that line on time, so... | |
| 71. Dail testified as follows:<br><br>Q. Did -- did you ever time the amount of time that you had in the cafeteria --<br>MR. CHANDLER: Objection. It's overly broad. It's vague and ambiguous.<br>Q. -- when you were on a rest break?<br>MR. CHANDLER: Same objection.<br>A. Roughly everybody would pretty much estimate, and when our line felt that it was time, we would go back in.<br>Q. So you decided as a line when to go back in?<br>MR. CHANDLER: Objection; speculation, asked and answered, overly broad, vague and ambiguous.<br>A. Roughly.<br>Q. Were there clocks in the cafeteria?<br>A. I believe so.<br>***<br>Q. Who told you when breaks were over when you were in the pasta room?<br>MR. CHANDLER: Overly broad.<br>A. Nobody did.<br>***<br>Q. Was somebody telling you to come back before the ten minutes were up?<br>MR. CHANDLER: Same objections.<br>A. I'm not sure.<br>Q. So you don't know why you were going back before the ten minutes were up?<br>MR. CHANDLER: Objection. It's argumentative, asked and answered, overly broad, vague, ambiguous.<br>A. We were told to be back at the line in ten | Dail Dep. at 82:03-:20, 88:09-:12, 101:09-102:15. |

DEFENDANT TAYLOR FARMS PACIFIC, INC.'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT; CASE NO. 2:13-CV-01282-KJM-AC

Gibson, Dunn & Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| minutes.<br>Q. Who told you to be back at the line in ten minutes?<br>A. I don't recall them, as I stated before.<br>Q. I thought you testified earlier that you needed to be back at the line in 15 minutes.<br>MR. CHANDLER: Objection; argumentative, asked and answered, overly broad. Answer to the best of your ability.<br>A. Okay. Correct. Basically, you had to be back at the line no later than in 15 minutes. But what I was stating as "the break," ten minutes; we did not get no ten minutes' break.<br>Q. But you weren't timing it; correct?<br>MR. CHANDLER: Objection; asked and answered, overly broad, argumentative.<br>A. Not fully, 100 percent, no.<br>Q. Yeah. But you testified earlier that you didn't time it?<br>A. Correct. | |
| 72. Dail testified as follows:<br><br>Q. And during your lunch, you could – you could take it in the cafeteria, or you could leave if you like; correct?<br>A. They – they preferred that you didn't leave, because there wasn't enough time to go anywhere really.<br>Q. Well, who said that they preferred that you didn't leave?<br>A. The boss.<br>Q. Teresa Rea told you that she preferred that you didn't leave?<br>A. I don't know if it was exactly her or if it was the trainer, but they preferred that we didn't leave. And there was also a taco truck available to us outside.<br>Q. When were you told that – that whoever it was preferred that you didn't leave?<br>A. When I was first hired in.<br>Q. So at orientation?<br>A. At orientation. And I think as well after I was talking with Teresa, when I first got hired on and everything.<br>Q. Okay.<br>A. They said they preferred you didn't leave because of time-wise – | Dail Dep. at 77:10-78:12. |

Gibson, Dunn &<br>Crutcher LLP

DEFENDANT TAYLOR FARMS PACIFIC, INC.'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT; CASE NO. 2:13-cv-01282-KJM-AC

| Undisputed Fact | Supporting Evidence |
|---|---|
| Q.  Were you – <br> A. – but – <br> Q.  Sorry. <br> A. – but you could leave.  They weren't telling you absolutely no. | |
| 73. Dail testified as follows: <br><br> Q. And why did you understand that your break was late? <br> MR. CHANDLER: Same objections. Go ahead. <br> A. Because I would work over so many hours or whatever -- however you would say it. I believe after two hours, you're supposed to have a break. Sometimes it would take me three hours, sometimes three and a half hours. It just depended. It depended on what I was working on. | Dail Dep. at 63:04-:12. |
| 74. Dail testified as follows: <br><br> Q. So you said on salads that Kenneth and Teresa -- sorry -- on samples, Kenneth and Teresa told you that you couldn't go on break until whatever you were doing was done; correct? <br> MR. CHANDLER: Objection to the extent it's asked and answered, misstates her testimony. But go ahead. <br> A. They didn't exactly say, no, you could not go on break. <br> Q. So what did they say? <br> MR. CHANDLER: Same objection; it's overly broad. <br> A. To finish up what you're working on and then go on break. <br> Q. But if you needed to go on a break or take a break, could you take a break? <br> MR. CHANDLER: Objection; speculation, lacks foundation, vague, ambiguous, overly broad, argumentative. <br> A. I'm sure I could have if I really, really wanted to. <br> Q. Did you ever ask? <br> A. No. I usually just went with whatever they told me. <br> Q. Well, how long -- I mean when you went -- went over to samples, how long was the | Dail Dep. at 60:05-61:15, 62:02-:19, 64:14-:18. |

Gibson, Dunn & Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| -- how long would it take you to prepare the samples that you needed to prepare before you could go on break?<br>MR. CHANDLER: Before you answer the question, I will object that it's overly broad, vague, ambiguous.<br>A. Sorry. Could you repeat the question?<br>MS. ZENEWICZ: Could you read back the question, please?<br>(Record read out loud.)<br>A. It was various times, so I can't specifically state how long one -- one thing would take.<br>***<br>Q. Did it ever take you more than three hours?<br>MR. CHANDLER: Same objections.<br>A. I'm unsure.<br>Q. Did it ever take you more than two hours?<br>MR. CHANDLER: Same objections.<br>A. As well -- at times it did, yes.<br>Q. On average, do you recall how long it took you?<br>A. I don't.<br>MR. CHANDLER: Wait. Before you answer -- Same objections. You've got your answer. That's fine.<br>A. And I don't.<br>Q. Did you ever time how long it would take you?<br>MR. CHANDLER: Same objections.<br>A. No.<br>***<br>Q. So you don't recall when your breaks actually happened when you were on samples?<br>MR. CHANDLER: Objection. It's vague and ambiguous, asked and answered, argumentative.<br>A. No. | |
| 75. Dail testified as follows:<br><br>Q. So when you were -- when you were at -- in the pasta room, and if you started at 7:00 a.m., when did you take your first rest break? | Dail Dep. at 65:23-66:04, 66:24-68:08, 68:16-:19. |

Gibson, Dunn &
Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| MR. CHANDLER: Objection. It's overly broad, vague and ambiguous.<br>A. It depended. It depended on what we were working on.<br>\*\*\*<br>Q. Okay. So if you started at 7:00 a.m., did you have a rest break around 9:00 a.m.?<br>MR. CHANDLER: Objection; overly broad, vague and ambiguous.<br>A. Sometimes, sometimes not.<br>Q. How often not?<br>A. I'm unsure.<br>Q. When would you have it if you didn't have it at around 9:00 a.m.?<br>MR. CHANDLER: Same objections.<br>A. It's a wide-open range of time. I can't specifically state that.<br>Q. So a range of time from when to when? I mean, are we talking about from 7:15 a.m. to 11:00 a.m.? Give me -- give me a range of time.<br>MR. CHANDLER: Same objections.<br>A. Again, like I said, I can't state a certain time, because it was when we were done with production, or if we were moved on to another product.<br>Q. So you can't say how often your -- so you can't say how often your breaks occurred around the two-hour mark?<br>MR. CHANDLER: Same objections; asked and answered.<br>A. No.<br>Q. And you can't say when they actually occurred, if they occurred --<br>MR. CHANDLER: Same --<br>Q. -- before or later?<br>MR. CHANDLER: Same objections.<br>A. No.<br>\*\*\*<br>Q. So you weren't keeping track?<br>A. No.<br>Q. Did you wear a watch?<br>A. No, I didn't. | |
| 76. Dail does not claim to have suffered any damages arising from late rest breaks in response to discovery requests regarding her alleged damages in connection with | Hansen Decl. Ex. N (Plaintiff Rosemary Dail's Amended Responses to Defendant Taylor Farms Pacific, Inc. Form Interrogatory – Employment Law, Set One, No. 210.2). |

Gibson, Dunn & Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| this action. | |
| 77. Dail claims that she is owed $4,000 in statutory wage statement penalties. | Hansen Decl. Ex. N at 3. |
| 78. Dail does not claim to have suffered any damages arising from Labor Code sections 221-223 and 401-410. | Hansen Decl. Ex. N; Hansen Decl. Ex. F. |
| **Wendell T. Morris** | |
| 79. Morris testified as follows:<br><br>Q. Okay. Other than the issue regarding breaks, do you have an understanding -- are you making any other claims for damages or harm in connection with this lawsuit that you feel like you're entitled to?<br>MR. KARCZEWSKI: Object to the form; compound, calls for legal conclusion, vague. Go ahead, if you understand.<br>A. No. | Hansen Decl., Ex. O (hereinafter "Morris Dep.") at 73:03-:10. |
| 80. Morris worked as an employee of Manpower, Inc. from March 24, 2012 to April 29, 2012; as an employee of Quality Farm Labor, Inc. through SlingShot Connections, LLC, from April 29, 2012 to July 13, 2012; and as an employee of Taylor Farms Pacific from July 15, 2012 to November 24, 2012. | Hansen Decl., Ex. P (paystubs produced by Morris). |
| 81. Morris testified as follows:<br><br>Q. All right. And that helped jog your memory that your start date with Taylor Farms Pacific was July 15th, 2012?<br>A. July 9th -- month of July. I'm sorry. Just month 7 of July, I definitely got out of it.<br>Q. All right. It helped refresh your memory that you started with Taylor Farms Pacific in July 2012?<br>A. Yes.<br><br>***<br><br>Q. Okay. When did your work at the Taylor Farms Pacific facility end?<br>MR. KARCZEWSKI: Vague.<br>A. November 24th, 2012. | Morris Dep. at 107:03-:10; 129:06-:09. |

| Undisputed Fact | Supporting Evidence |
|---|---|
| 82. Morris testified as follows:<br><br>Q. Okay. On your way into the facility, would you punch in before putting on all of your sanitary gear?<br>MR. KARCZEWSKI: Vague, overbroad. Object to the form. Go ahead.<br>A. Yes.<br>Q. Okay. And would you take off your sanitary gear before punching out?<br>MR. KARCZEWSKI: Same objections.<br>A. Yes. | Morris Dep. at 121:11-:21. |
| 83. Morris testified as follows:<br><br>Q. Okay. At the end of the day when you would clock out, was there any rule about how soon after your work ended that you would need to clock out?<br>MR. KARCZEWSKI: Vague, assumes facts, calls for speculation. Go ahead.<br>A. No. Just at the end of the day, I just dress out, clock out, and go home. | Morris Dep. at 112:18-:25. |
| 84. Morris testified as follows:<br><br>Q. So earlier you said that in sanitation you didn't wear a helmet; is that right?<br>A. Yes.<br>Q. Okay. What gear did you wear in sanitation?<br>A. A green smock, a hairnet, plastic sleeves. That's all.<br>Q. Okay.<br>A. Rubber boots. I'm sorry. | Morris Dep. at 47:09-:16. |
| 85. Morris did not identify sanitizing equipment at home or attending meetings prior to the start of paid time as damages he suffered. | Hansen Decl., Ex. Q (Plaintiff Wendell Morris' Amended Responses to Defendant Taylor Farms Pacific, Inc. Form Interrogatory-Employment Law, Set One, No. 210.2). |
| 86. Morris testified as follows:<br><br>Q. All right. And then there was a lunch break after the morning break; is that right?<br>A. Yes.<br>MR. KARCZEWSKI: Vague. I am sorry.<br>Q. Okay. And what did she communicate to you when she was trying to keep you on a fixed break schedule about the timing of your lunch break?<br>MR. KARCZEWSKI: Assumes facts, misstates witness's testimony. Object to | Morris Dep. at 87:05-88:14. |

Gibson, Dunn & Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| the form; vague, overbroad.<br>A.  Lunch, I received. She left --<br>Q.  On what schedule?<br>A.  She left lunch up to me.<br>Q.  Okay. And what do you mean by that?<br>A.  Because I was a good employee. And before I took lunch, I made sure the line that I was assigned to could come back from their lunch and go to work. So I would make sure that I would take care of theirs -- just half of the production, so that the coworkers can go. We kind of pulled together for lunch, so lunch was no problem.  I had lunch every time, for 30 minutes, and sometimes I might have been -- nope. That's fine. Yes. I had lunch.<br>Q.  Okay. So and when you say you had lunch for 30 minutes, that was 30 minutes, at least, in the cafeteria; is that right?<br>MR. KARCZEWSKI: Vague. Overbroad.<br>A.  Cafeteria is full. I always ate outside.<br>Q.  Okay. So either in the cafeteria or outside?<br>A.  Yes.<br>Q.  And that's 30 minutes off the clock; right?<br>A.  Yes. | |
| 87. Morris testified as follows:<br><br>Q.  And what time did you generally structure your lunch when working in sanitation?<br>MR. KARCZEWSKI: Vague, calls for speculation, overbroad. Go ahead.<br>A.  I just watched the floor. When it was a good time that would work for the company, and then I would say, "Hey, I've got a 30-minute window. I'll take lunch."<br>Q.  And sometimes you'd take it earlier; sometimes you'd take it later. Is that right?<br>A.  Never before 12:00.<br>Q.  Is that because somebody told you you couldn't take it before 12:00?<br>MR. KARCZEWSKI: Object to the form.<br>A.  No.<br><br>***<br><br>Q.  All right. So as you sit here today, is | Morris Dep. at 88:18-89:09; 91:04-:10. |

DEFENDANT TAYLOR FARMS PACIFIC, INC.'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT; CASE NO. 2:13-cv-01282-KJM-AC

Gibson, Dunn &<br>Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| there anything that you can recall that prevented you from taking a lunch before 12:00 if you wanted to?<br>MR. KARCZEWSKI: Asked and answered. He's given you an answer twice now. You don't like it. Go ahead.<br>A. No. | |
| 88. Morris testified as follows:<br><br>Q. I want to ask you now about instances in which you may have taken a second 30-minute meal break when working at the Taylor Farms Pacific facility. Did that ever happen?<br>MR. KARCZEWSKI: Object to the form of the question; compound, vague, misstates the witness's testimony.<br>A. A second 30-minute lunch break would only be, for me, if I worked past ten hours.<br>Q. Right. And in those instances, would the meal break work -- the second meal break work the same way as the first meal break?<br>MR. KARCZEWSKI: Incomplete hypothetical, calls for speculation. Object to the form of the question; vague, assumes facts. Go ahead.<br>A. Yes.<br>Q. In other words, there was no difference between the way you treated the first meal break and the second meal break; right?<br>MR. KARCZEWSKI: Same objections.<br>A. Yes. | Morris Dep. at 113:08-114:04. |
| 89. Morris testified as follows:<br><br>Q. Okay. So in your personal experience, when you did take a break, how long were the breaks that you took, measured for the time that you spent outside the facility?<br>MR. KARCZEWSKI: Vague, assumes facts, calls for speculation, overbroad.<br>A. Ten minutes. | Morris Dep. at 93:03-:08. |
| 90. Morris testified as follows:<br><br>Q. Mr. Morris, did you receive pay stubs for the period of time when you were working at the Taylor Farms Pacific | Morris Dep. at 122:05-:22. |

DEFENDANT TAYLOR FARMS PACIFIC, INC.'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT; CASE NO. 2:13-cv-01282-KJM-AC

Gibson, Dunn & Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| facility?<br>A. Yes.<br>Q. Okay. And did you review those pay stubs when you received them?<br>A. Yes. I looked to make sure they were mine and all, yeah. Yes.<br>Q. All right. Was there anything about the pay stubs that you found to be inaccurate?<br>MR. KARCZEWSKI: Vague, overbroad.<br>A. Taylor Farm pay stubs, no. They seemed to be okay.<br>Q. All right. Okay. Nothing confusing about them as far as you can recall?<br>MR. KARCZEWSKI: Vague.<br>A. No, nothing. | |
| 91. Janis Sonneman, testifying on behalf of SlingShot Connections, LLC, testified as follows:<br><br>Q. Okay. Has anybody from Taylor ever contacted anybody from SlingShot, to your understanding, to review invoices that go from SlingShot to Taylor to ensure that the amounts paid to the employees comply with California wage laws?<br>MS. SHAH: Objection, assumes facts not in evidence, lacks foundation, compound, vague and ambiguous, calls for speculation.<br>MR. HANSEN: And calls for a legal conclusion.<br>A. I don't know.<br>Q. Nobody from Taylor has ever sat down to talk to you about that?<br>A. To me personally, no. | Hansen Decl., Ex. S at 99:25-100:12. |
| 92. Morris testified as follows:<br><br>Q. And other than the fact that he was an attorney and that he happened to be familiar with Taylor Farms, what is it about the discussion that you led you to conclude that you wanted an attorney in connection with your work at Taylor Farms?<br>MR. KARCZEWSKI: Object to the form of the question; compound, vague, assumes facts.<br>A. Because I felt I needed one from working at Taylor Farms.<br>Q. Needed one for what purpose? | Morris Dep. at 64:09-68:10. |

DEFENDANT TAYLOR FARMS PACIFIC, INC.'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT; CASE NO. 2:13-CV-01282-KJM-AC

Gibson, Dunn & Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| A. The way I was treated. | |

A. The way I was treated.
Q. Anything else?
A. That's enough.
Q. Anything else other than that?
A. No. I wasn't treated right.
Q. All right. And what do you mean by that?
A. Job postings, for example. They would be on the wall. I would go to HR, apply for the job. A week go by. Someone else working in the job, and I'd be like, "Oh, you got the job?" They be like, "Yeah. They just came to me and asked me if I wanted to work there." To me, they were just giving the job without interviews to who they wanted to in certain areas. And then when I'd bring it to HR attention, it was like I didn't even get an interview, you know. And she'd say, "Oh, I'm going to check on it or see what's going on," and then find out it was scheduled to interview on my day off, or someone else day off, you know. Yeah. It's just -- it's just horrible there.
Q. Okay. In terms of your belief that you were not treated --
A. Fairly --
Q. -- right --
A. Yes.
Q. -- was there anything else other than the job postings and scheduling of interviews?
A. Yes.
Q. What else?
A. Breaks. I didn't get breaks every day.
Q. Anything else?
A. Yes. I was pressured into working past eight hours, like my job was on the line if I didn't stay.
Q. Anything else?
A. What else? It's a lot more, but it's like just kind of, you know -- let me see. (Witness mumbling to self.) Jobs -- breaks --
THE REPORTER: I'm sorry?
A. I know. I'm sorry. Breaks -- yeah. Just the -- the time clock thing for us, the distance from the parking lot to the job. You know, just when you do come in from breaks or lunch, the way the supervisor make you feel like you were longer than you were. It's just mentally, it's just -- it's not good.
Q. What do you mean supervisor makes you --

DEFENDANT TAYLOR FARMS PACIFIC, INC.'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT; CASE NO. 2:13-cv-01282-KJM-AC

Gibson, Dunn &
Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| A. Anyone with a hairnet other than white would be like, "Where were you? You have been gone two hours." Or "Look over there. You need to clean that up." It's just -- you know, make you feel as though you weren't where you supposed to be when you were, or if you take a break, it's going to stop production, you know.<br><br>Q. In sanitation, if you took a break, it certainly wouldn't stop production; right?<br><br>MR. KARCZEWSKI: Object to the form; misstates the witness's testimony, vague, overbroad, assumes facts. Go ahead.<br><br>A. Yes, they would make you feel like it. Because sanitation, once they stopped one salad, and then they change over to another salad, everything has to be sanitized.<br><br>Q. So in terms of your testimony earlier, earlier you said that there were times when you took a break separate and apart from the rest of the line. When that happened, production didn't stop; right?<br><br>MR. KARCZEWSKI: Object to the form of the question; misstates the witness's testimony, assumes facts, vague, argumentative.<br><br>A. I'm going to --<br><br>MR. KARCZEWSKI: If you understand, go ahead.<br><br>A. From week to week, it would change only because she would try to get me to stay in more. This week, she'll say, "Oh, you take break with your line." So when I take break with my line, we come back, no one sanitized the facility. Then it switches. "Oh, you take break after your lunch. Stay. Clean the line. When your line come back, then you take break." Next week, "Oh, you sanitation, you not production, because these lines need to be cleaned." So therefore, I don't even get a break many days. I don't even -- I just stay in and clean.<br><br>Q. All right. In terms of not being treated right, you've listed out a number of things that you felt resulted in you not being treated right. Is there anything else that you haven't already described that led you to believe that you weren't being treated right?<br><br>A. That's all at this time that I can recall. | |

DEFENDANT TAYLOR FARMS PACIFIC, INC.'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT; CASE NO. 2:13-cv-01282-KJM-AC

Gibson, Dunn &
Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| 93. Morris provided interrogatory responses on April 25, 2013, in which, asked to identify "any written rules, guidelines, or procedures established by" Taylor Farms Pacific, he did not identify any policies prohibiting employees from leaving the company grounds premises during meal breaks. | Hansen Decl., Ex. R, at 3 (Plaintiff Wendell T. Morris' Responses to Defendant Taylor Farms Pacific, Inc. Form Interrogatory-Employment Law, Set One) (Interrogatory 200.4). |
| 94. Morris does not claim to have suffered any damages arising from Labor Code sections 221-223 and 401-410. | Hansen Decl. Ex. Q; Hansen Decl. Ex. F. |
| 95. Morris testified as follows:<br><br>Q. Okay. Other than the issue regarding breaks, do you have an understanding -- are you making any other claims for damages or harm in connection with this lawsuit that you feel like you're entitled to?<br>MR. KARCZEWSKI: Object to the form; compound, calls for legal conclusion, vague. Go ahead, if you understand.<br>A. No. | Morris Dep. at 73:03-:10. |
| 96. Plaintiff Wendell T. Morris sent a letter via certified mail to the California Labor & Workforce Development Agency ("LWDA") titled "Notice of California Labor Code Violations Pursuant to California Labor Code § 2699 et seq" on April 9, 2013, and sent a copy of that letter to the counsel of Taylor Farms Pacific "Via Facsimile only." | 7AC ¶ 95.<br><br>Hansen Decl., Ex. T. (hereinafter cited as "PAGA Letter"). |
| 97. No Plaintiff other than Morris sent any type of PAGA letter to the LWDA. | Hansen Decl., Ex. U, at 11-12 (Plaintiff Rosemary Dail's Responses to Defendant Taylor Farms Pacific, Inc. Form Interrogatories – Employment Law, Set One) (Form Interrogatory 208.1) (Plaintiff did not file a claim, complaint, or charge with any governmental agency related to allegations in the complaint)<br><br>Hansen Decl., Ex. V, at 11-12 (Plaintiff Consuelo Hernandez' Responses to Defendant Taylor Farms Pacific, Inc. Form Interrogatories – Employment Law, Set One) (Form Interrogatory 208.1) (same)<br><br>Hansen Decl., Ex. E, at 11-12 (Plaintiff Maria del Carmen Penas [sic] Responses to Defendant Taylor Farms Pacific, Inc. Form |

Gibson, Dunn & Crutcher LLP

| Undisputed Fact | Supporting Evidence |
|---|---|
| | Interrogatories – Employment Law, Set One) (Form Interrogatory 208.1) (same) |
| | Hansen Decl., Ex. K, at 11-12 (Plaintiff Leticia Suarez' Responses to Defendant Taylor Farms Pacific, Inc. Form Interrogatories – Employment Law, Set One) (Form Interrogatory 208.1) (same) |
| | 7AC ¶ 95 (no allegation that any plaintiff except Morris sent any type of letter to the LWDA) |
| 98. On March 13, 2013, Hernandez served discovery responses in which, asked to identify any "written rules, guidelines, policies, or procedures established by" Taylor Farms Pacific, she did not identify any policy prohibiting her from leaving company grounds during meal breaks. | Hansen Decl., Ex. V at 3-4 (Form Interrogatory 200.4). |

DATED:  July 11, 2014                    GIBSON, DUNN & CRUTCHER LLP

                            By:    /s/ Jesse A. Cripps                            
                                   Jesse A. Cripps
                                   Attorney for Defendant
                                   TAYLOR FARMS PACIFIC, INC.

DEFENDANT TAYLOR FARMS PACIFIC, INC.'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT; CASE NO. 2:13-cv-01282-KJM-AC

**DECLARATION OF SERVICE**

I, Joseph Hansen, declare as follows:

I am employed in the County of San Francisco, State of California; I am over the age of eighteen years and am not a party to this action; my business address is 555 Mission Street, Suite 3000, San Francisco, California 94105, in said County and State.  On the date indicated below, I served the:

**DEFENDANT TAYLOR FARMS PACIFIC, INC.'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

in the manner described below:

☑   **BY ELECTRONIC TRANSFER TO THE CM/ECF SYSTEM**:  On this date, I electronically uploaded a true and correct copy in Adobe "pdf" format of the above-listed document(s) to the United States District Court's Case Management and Electronic Case Filing (CM/ECF) system.  After the electronic filing of a document, service is deemed complete upon receipt of the Notice of Electronic Filing ("NEF") by the registered CM/ECF users.

I certify under penalty of perjury that the foregoing is true and correct, and that this Certificate of Service was executed by me on July 11, 2014 at San Francisco, California.

/s/_____
                    Joseph Hansen

Gibson, Dunn & Crutcher LLP

1