1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   MARIA DEL CARMEN PENA, et al.,            No.  2:13-cv-01282-KJM-AC

12                Plaintiffs,

13         v.                                  ORDER

14   TAYLOR FARMS PACIFIC, INC., d/b/a
     TAYLOR FARMS, et al.,

15
                 Defendants.
16

17

18         The plaintiffs, hourly workers, move for class certification against their current

19   and former employers.  Pls.' Mot. Class Cert., ECF No. 56.[1]  Three defendants, Taylor Farms

20   Pacific, Inc. (TFP), Abel Mendoza, Inc. (AMI), and SlingShot Connections, LLC (SlingShot),

21   oppose their motion.  Def. TFP's Opp'n Class Cert. (TFP Opp'n), ECF No. 92; Def. AMI's

22   Opp'n Class Cert. (AMI Opp'n), ECF No. 100; Def. SlingShot Opp'n Class Cert. (SlingShot

23   Opp'n), ECF No. 102.  Plaintiffs have replied.  Pls.' Reply Class Cert. (Reply), ECF No. 112.

24   The court heard argument on November 22, 2013.  Patricia Oliver and Stuart Chandler

25

26         [1] The plaintiffs have included, with the same filing, their motion for class certification
     and a memorandum of points and authorities in support of that motion.  To avoid confusion in
     citations to specific pages of these filings, citations to the motion are denoted by "Mot.," and
     citations to the memorandum are denoted by "Mem."

                                           1

1    appeared for the plaintiffs.  Jesse Cripps and Sarah Zenewicz appeared for defendant TFP;

2    Hope Case and Luanne Sacks appeared by telephone for defendant SlingShot; and Michael

3    Claiborne appeared for defendant AMI.  As explained below, the motion is GRANTED IN

4    PART and DENIED IN PART.

5    I.        BACKGROUND

6              A.        Claims and Previous Orders

7                        TFP operates two food production and processing plants in Tracy, California.

8    Mem. 5.  The plaintiffs used to work in these plants.  *Id.*  They seek to represent a class of the

9    defendants' current and former employees and bring employment claims.  Seventh Am. Compl.

10   (Compl.) 11-25, ECF No. 101.[2]  Their claims arise from three core allegations: that the

11   defendants did not pay them for time spent putting on and taking off mandatory personal

12   protective equipment, that is "donning and doffing" the equipment, *see, e.g.*, *id.* ¶¶ 31, 33; that

13   the defendants did not allow them rest breaks and meal breaks as required by California labor

14   law, *see, e.g.*, *id.* ¶¶ 33, 47-50; and that they did not receive paychecks in the form and at the

15   time California law requires, *see, e.g.*, *id.* ¶¶ 68, 76.  Specifically, the plaintiffs' plead eight

16   claims:

17           1.        For compensation for all hours worked under California Labor Code § 204 and

18                     California Code of Regulations title 8, § 11040(11)(A), Compl. ¶¶ 29-35;

19           2.        For overtime wages under California Labor Code §§ 200, 510(a), and 1194(a)

20                     and California Code of Regulations title 8, § 11040(11)(A), Compl. ¶¶ 36-45;

21           3.        For failure to offer duty-free meal and rest periods under California Labor Code

22                     §§ 226.7 and 512, Compl. ¶¶ 46-51;

23

24   _____

     [2] When the plaintiffs filed their motion for class certification, the Sixth Amended
     Complaint, ECF No. 33, was the operative pleading.  The plaintiffs since amended the
25   complaint in response to this court's order.  *See* Order 21, ECF No. 76.  Because "an amended
     pleading supersedes the original pleading," *Ferdik v. Bonzelet*, 963 F.2d 1258, 1262 (9th Cir.
26   1992), *as amended* (May 22, 1992), the court now considers the plaintiffs' motion for class
     certification in light of the Seventh Amended Complaint, although this does not change the
     court's analysis.

4.    For failure to offer certain 30-minute meal and 10-minute rest breaks under California Labor Code § 512 and California Code of Regulations title 8, § 11080, Compl. ¶¶ 52-61;

5.    For unpaid wages and waiting time penalties under California Labor Code §§ 201-203, Compl. ¶¶ 62-72;

6.    For failure to properly itemize pay stubs in violation of California Labor Code §§ 226(a) and (e), Compl. ¶¶ 73-78;

7.    For violation of California's Unfair Competition Law (UCL), Business and Professional Code §§ 17200 *et seq.*, Compl. ¶¶ 79-92; and

8.    To enforce California's Private Attorney General Act (PAGA), California Labor Code §§ 2698-2699.5, Compl. ¶¶ 93-96.

The court has previously issued several orders, which limit the scope of the court's inquiry in response to this motion. On October 15, 2013, the court granted TFP's motion to dismiss plaintiff Morris's fifth claim and the seventh claim insofar as it was based on the fifth. Order, ECF No. 76. On March 28, 2014, the court granted TFP's motion for summary judgment as to plaintiff Suarez's first, second, and seventh claims based on her dressing and removing personal protective equipment. Order, ECF No. 144. On April 23, 2014, the court granted Manpower's motion to dismiss plaintiffs Hernandez's and Morris's fourth and eighth claims, the sixth claim as premised on failure to itemize wage payments for noncompliant meal and rest breaks, and the seventh claim as based on the claims dismissed in the same order. Order, ECF No. 146. On February 4, 2015, the court granted TFP's motion for summary judgment on the sixth claim as to plaintiffs Pena, Suarez, and Dail and the eighth claim as to all plaintiffs. Order, ECF No. 199.[3] On the same day, the court granted AMI's

/////

---

[3] Manpower joined in this order. Joinder, ECF No. 197. The motion granting summary judgment on the sixth claim as to plaintiffs Pena, Suarez, and Dail and the eighth claim as to all plaintiffs therefore applies equally to Manpower.

1   motion for summary judgment as to all claims brought by plaintiffs Hernandez, Suarez, Dail,

2   and Morris and as to plaintiff Pena's fourth, sixth, and eighth claims.  Order, ECF No. 198.

3          To the extent the plaintiffs' seventh unfair competition claim survives, it is

4   based on plaintiffs' Labor Code claims.  *See* Compl. ¶ 83.  As the seventh claim is entirely

5   derivative of the first six, it is not evaluated separately here.  To the extent the PAGA claim

6   survives, it is also derivative of other Labor Code violations and not evaluated separately here.

7   *See* Cal. Lab. Code § 2699.

8          B.      Class and Subclass Definitions

9          Plaintiffs' proposed class includes those persons who are both: (1) a current or

10  former nonexempt hourly employee of TFP, or a joint or dual employee of TFP and one or

11  more of the other defendants, and (2) someone who worked within the class period, between

12  four years before filing of the class action and the date notice is mailed to the class.[4]  Compl.

13  ¶ 5(A).

14         The plaintiffs also move to certify four subclasses.  The first subclass is the

15  "donning and doffing subclass."[5]  *Id.* ¶ 5(B).  It includes putative class members who worked

16  at TFP's Tracy facilities and were required to wear protective equipment, but did not receive

17  pay for time spent putting on and taking off that equipment.  *Id.*  The second subclass is the

18  /////

19

20         [4] The plaintiffs describe the class as follows: "All former and current non-exempt hourly employees of [TFP] and joint/dual employees of [TFP] and [co-d]efendants, who

21  worked at facilities owned and/or operated by [TFP] during the four-year period preceding the filing of this action through the date notice is mailed to the class." Mot. at 1.

22         [5] The plaintiffs define this subclass to include "[a]ll non-exempt hourly workers paid by

23  [TFP], and all non-exempt hourly workers controlled by [TFP], but paid by [co-d]efendants who worked pursuant to [TFP]'s rules and regulations and were required to wear personal

24  protective equipment ("PPE") to protect against the cross contamination of food, food-contact surfaces, or food-packaging materials, and who are/were required to don and [doff] those items,

25  of equipment, without compensation, sanitize their person and equipment before the start of their paid shifts, doff those items of equipment, without compensation after the end of their

26  paid shifts, and/or don, doff those items of equipment and sanitize their persons and equipment during their meal and rest . . . breaks." Mot. 1-2.

"mixed hourly worker subclass."[6]  *Id.* ¶ 5(C).  It includes putative class members who worked

at TFP's Tracy facilities and were either required to be back to work "within" thirty minutes

after beginning a meal break or "within" ten minutes after beginning a rest break, or who were

"not offered" meal and rest breaks within certain time frames required by California law.  *Id.*

The third subclass, the "waiting time penalties subclass," includes putative class members who

either resigned or were terminated and did not receive a timely or complete paycheck.[7]  *Id.*

¶ 5(D).  The fourth subclass is the "wage statement subclass," and includes putative class

members who did not receive wage statements that included the information California law

requires.[8]  *Id.* ¶ 5(E).

C.      This Motion and Evidentiary Matters

        The plaintiffs filed their motion for class certification on October 4, 2013.

Mot. 3.  They filed several documents in support of the motion on October 5, 2013.  *See* ECF

Nos. 58-65.  TFP objects to these filings as untimely.  TFP's Objections to Pls.' Evidence 14,

ECF No. 97.  Because the delay was the result of unforeseen technical difficulties, *see* James

Decl., ECF No. 113-1, and caused no prejudice, the court overrules this objection.  TFP also

---

[6] The plaintiffs define this subclass to include "[a]ll individuals who currently, or formerly worked either as direct employees of [TFP], or joint/dual employees of [TFP] and [co-d]efendants, within the applicable statute of limitations, as nonexempt hourly workers, in any capacity, at [TFP's] Tracy, California facilities and who were not offered meal breaks within 5 hours of having started work and/or were not offered a second thirty minute meal break on work days of 10 hours or longer and/or were not offered at least two rest breaks, during work days of 8-10 hours, and/or were required to be back at their work stations ready to work within 30 minutes during meal breaks and within 10 minutes during rest breaks."  Mot. 1-2.

[7] The plaintiffs define this subclass to include "[a]ll former nonexempt hourly workers paid by [TFP], who, irrespective of whether they resigned or were fired, and irrespective of whether paid by [TFP] or by [co-d]efendants, did not either a). receive their final pay checks on a timely basis and/or b). did not receive all monies due and owing to them in their final pay checks, regardless of whether the checks were payable by [TFP] or by [co-d]efendants."  Mot. 2.

[8] The plaintiffs define this class to include "[a]ll non-exempt hourly workers paid by [TFP], and all non-exempt hourly workers controlled by [TFP], but paid by [co-d]efendants, who worked pursuant to [TFP]'s rules and regulations whose wage statements did not accurately set forth all required information as required by California Labor Code section 226(a)."  Mot. 2.

objects to most of the documentary evidence the plaintiffs offered in support of their motion on the ground that it does not satisfy the requirements of the Federal Rules of Evidence. *See generally* TFP's Objections to Evidence, ECF No. 97. But "evidence presented in support of class certification need not be admissible at trial." *Pedroza v. PetSmart, Inc.*, No. 11-298, 2013 WL 1490667, at *1 (C.D. Cal. Jan. 28, 2013) (citing *Keilholtz v. Lennox Hearth Prods. Inc.*, 268 F.R.D. 330, 337 n.3 (N.D. Cal. 2010) and *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 599 (C.D. Cal. 2008)). Moreover, documents may "be authenticated by review of their contents if they appear to be sufficiently genuine." *Las Vegas Sands v. Nehme*, 632 F.3d 526, 533 (9th Cir. 2011) (quoting *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 778 n.24 (9th Cir. 2002)). That is the case here.

TFP opposed the plaintiffs' motion to certify on November 4, 2013. On the same day, AMI and SlingShot joined TFP's opposition and opposed separately. The plaintiffs replied on November 18, 2013. With their reply, plaintiffs included several additional declarations. *See* Downey Decl., ECF Nos. 112-2, 112-3; Pena Decl., ECF No. 112-4; Suarez Decl., ECF No. 112-5; Dail Decl., ECF No. 112-6; Morris Decl., ECF No. 112-7. It is generally improper for a moving party to introduce new facts or different legal arguments in a reply brief. *Ojo v. Farmers Grp., Inc.*, 565 F.3d 1175, 1185 n.13 (9th Cir. 2009); *S.E.C. v. Gendarme Capital Corp.*, No. 11-0053, 2012 WL 346457, at *2 n.1 (E.D. Cal. Jan. 31, 2012). The court disregards these additional declarations.

In what follows, the court reviews federal law applicable to class actions in general, then considers certification of the proposed class and each subclass in turn.

## II.   CLASS ACTIONS IN GENERAL

Litigation by a class is "an exception to the usual rule" that only the individual named parties bring and conduct lawsuits. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (citation and internal quotation marks omitted). Only when a class action "promot[es] . . . efficiency and economy of litigation," should a motion for certification be

1    granted.  *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 349 (1983).  A court considers

2    whether class litigation promotes "economies of time, effort and expense, and . . . uniformity of

3    decisions as to persons similarly situated, without sacrificing procedural fairness or bringing

4    about other undesirable results." Fed. R. Civ. P. 23(b)(3) advisory committee's note.

5            To be eligible for certification, the proposed class must exist:  it must be

6    "precise, objective, and presently ascertainable."  *Williams v. Oberon Media, Inc.*, No. 09-

7    8764, 2010 WL 8453723, at *2 (C.D. Cal. Apr. 19, 2010), *aff'd*, 468 F. App'x 768 (9th Cir.

8    2012); *see also* 7A Charles Alan Wright et al., *Federal Practice and Procedure* § 1760 (3d ed.

9    2005) ("If the general outlines of the membership of the class are determinable at the outset of

10   the litigation, a class will be deemed to exist." (citations omitted)).  The proposed class

11   definition need not identify every potential class member from the very start.  *E.g.*, *Doe v.*

12   *Charleston Area Med. Ctr., Inc.*, 529 F.2d 638, 645 (4th Cir. 1975); *O'Connor v. Boeing N.*

13   *Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998).  The requirement is a practical one.  It is

14   meant to ensure the proposed class definition will allow the court to efficiently and objectively

15   ascertain whether a particular person is a class member, *see In re TFT-LCD (Flat Panel)*

16   *Antitrust Litig.*, 267 F.R.D. 583, 592 (N.D. Cal. 2010), *amended in part*, No. 07-1827, 2011

17   WL 3268649 (N.D. Cal. July 28, 2011)), for example, so that each putative class member can

18   receive notice, *O'Connor*, 184 F.R.D. at 319.

19           Class certification is governed by Federal Rule of Civil Procedure 23.  The court

20   must determine whether to certify a putative class, and if it does, it must define the class claims

21   and issues and appoint class counsel. Fed. R. Civ. P. 23(c)(1), (g).  Under Rule 23(c)(5), for

22   purposes of certification, a subclass is treated exactly like a class.  To be certified, a putative

23   class must meet the threshold requirements of Rule 23(a) and the requirements of one of the

24   subsections of Rule 23(b), which defines three types of classes.  *Leyva v. Medline Industries*

25   *Inc.*, 716 F.3d 510, 512 (9th Cir. 2013).  Here the plaintiffs seek certification under Rule

26   /////

1  23(b)(3), which provides for certification of a class in which common questions of law and fact

2  predominate and a class action is the superior means of litigation.[9]  Mem. 13.

3          Rule 23(a) imposes four requirements on every class.  First, the class must be

4  "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Second,

5  questions of law or fact must be common to the class.  *Id.* R. 23(a)(2).  Third, the named

6  representatives' claims or defenses must be typical of those of the class.  *Id.* R. 23(a)(3).  And

7  fourth, the representatives must "fairly and adequately protect the interests of the class."  *Id.* R.

8  23(a)(4).  If the putative class meets these requirements, Rule 23(b)(3) imposes two additional

9  requirements: first, "that the questions of law or fact common to class members predominate

10  over any questions affecting only individual members," and second,  "that a class action is

11  superior to other available methods for fairly and efficiently adjudicating the controversy."  The

12  test of Rule 23(b)(3) is "far more demanding," than that of Rule 23(a).  *Wolin v. Jaguar Land*

13  *Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010) (quoting *Amchem Prods., Inc. v.*

14  *Windsor*, 521 U.S. 591, 623-24 (1997)).

15          "The party seeking class certification bears the burden of demonstrating that the

16  requirements of Rules 23(a) and (b) are met."  *United Steel, Paper & Forestry, Rubber, Mfg.*

17  *Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO C.L.C. v. ConocoPhillips Co.*,

18  593 F.3d 802, 807 (9th Cir. 2010).  This burden is real; Rule 23 embodies more than a "mere

19  pleading standard."  *Wal-Mart*, 131 S. Ct. at 2551.  The party must "prove that there are *in fact*

20  sufficiently numerous parties, common questions of law or fact, etc."  *Id.*  The trial court must

21  then conduct a "rigorous analysis" of whether the party has met its burden, *id.*, and "analyze

22          [9] The plaintiffs also claim their class meets the requirements of Rule 23(b)(2), Mot.

23  2:13, but do not later support this assertion in their argument, *see* Mem. 13, and the defendants
   address only certification under Rule 23(b)(3), *see* TFP Opp'n 19–24; AMI Opp'n 6, 11–13;

24  SlingShot Opp'n 4–5.  Rule 23(b)(2) provides for certification of a class if "the party opposing
   the class has acted or refused to act on grounds that apply generally to the class, so that final

25  injunctive relief or corresponding declaratory relief is appropriate respecting the class as a
   whole . . . ."  Fed. R. Civ. P. 23(b)(2).  Because the plaintiffs bear the burden of showing the

26  proposed class meets the requirements of Rule 23(b)(2), *Ellis v. Costco Wholesale Corp.*, 657
   F.3d 970, 980 (9th Cir. 2011), and they have not attempted to do so, the court denies their
   motion to the extent it is based on Rule 23(b)(2).

1    each of the plaintiff's claims separately," *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061,

2    1068 (9th Cir. 2014) (citing *Erica P. John Fund, Inc., v. Halliburton Co.*, 131 S.Ct. 2179, 2184

3    (2011)).   The court must verify the putative class's "actual, not presumed, conformance with

4    Rule 23(a) . . . ."  *Wal-Mart*, 131 S. Ct. at 2551 (alterations omitted) (quoting *Gen. Tel. Co. of*

5    *Sw. v. Falcon*, 457 U.S. 147, 160 (1982)).   This inquiry often overlaps with consideration of the

6    merits of the plaintiffs' substantive claims.  *Wal-Mart*, 131 S. Ct. at 2551–52.   Indeed, "a

7    district court *must* consider the merits if they overlap with the Rule 23(a) requirements."  *Ellis*,

8    657 F.3d at 981 (emphasis in original) (citing *Wal-Mart*, 131 S. Ct. at 2551–52; *see also*

9    *Comcast Corp. v. Behrend*, ___ U.S. ___, 133 S. Ct. 1426, 1433 (2013) ("[O]ur cases requir[e]

10   a determination that Rule 23 is satisfied, even when that requires inquiry into the merits of the

11   claim.").   These same "analytical principles" also apply to the court's analysis of whether the

12   plaintiff meets its burden under Rule 23(b).  *Comcast*, 133 S. Ct. at 1432.

13   III.   DONNING AND DOFFING SUBCLASS

14          For each proposed subclass, the court first describes applicable California law

15   and the plaintiffs' operable claims under that law.   Then the court describes the evidence the

16   plaintiffs have proffered in support of class certification, and lastly evaluates whether the

17   plaintiffs have met their burden.   The court does not consider whether the general class

18   encompassing each subclass could be independently certified because the proposed subclasses

19   in total embody the plaintiffs' claims.

20          A.   Applicable Law

21          If certified, the donning and doffing subclass would include members of the

22   general class who were required to put on, take off, and clean protective equipment without

23   pay, whether before starting work, after ending work, or during their meal and rest breaks.

24   Mot. 1.   In California, wage and hour claims are governed by two sources of law: the California

25   Labor Code and eighteen wage orders adopted by the Industrial Welfare Commission (IWC).

26   *Brinker Restaurant Corp. v. Superior Court*, 53 Cal. 4th 1004, 1026 (2012).   The California

1   Supreme Court accords these two sources of law equal dignity. *Id.* They are to be interpreted

2   "in light of the remedial nature of the legislative enactments" and "liberally construed with an

3   eye to promoting . . . [the] protection [of employees]." *Id.* at 1026–27 (quoting *Industrial*

4   *Welfare Com. v. Superior Court*, 27 Cal. 3d 690, 702 (1980)). Several provisions of the

5   California Labor Code and the IWC wage orders are relevant to the donning and doffing

6   subclass, based on three of the plaintiffs' claims.

7           First, IWC Wage Order No. 4-2001, Cal. Code Regs. tit. 8, § 11040(11) defines

8   certain required thirty-minute meal breaks.[10] The exact nature of these breaks is not relevant

9   here, but is discussed in greater detail below. *See infra* section IV.A. The wage order also

10  provides that "[u]nless the employee is relieved of all duty" during a meal break, it is

11  "considered an 'on duty' meal period and counted as time worked." Cal. Code Regs. tit. 8,

12  § 11040(11). The plaintiffs allege in their first claim that the defendants owe them wages for

13  the time they spent on these on-duty meal breaks because they were required to put on, take off,

14  and clean protective equipment during this time. Compl. ¶ 33. In their second claim, the

15  plaintiffs claim the defendants did not count time the putative class members spent putting on,

16  taking off, and cleaning protective equipment when calculating overtime pay. Compl. ¶¶ 41-

17  42. *See also* Cal. Lab. Code § 1194(a) (allowing an employee to recover in a civil action any

18  unpaid overtime wages, interest, attorney's fees, and costs). And in their third claim, the

19  plaintiffs point to a section of the wage order requiring an employer to pay one hour of pay at

20

21          [10] Plaintiffs cite IWC Order No. 4-2001 in their complaint, Compl. ¶ 33, but in their
    briefs the parties refer to several orders interchangeably, *see, e.g.*, Mem. 2 n.8 (citing IWC
22  Wage Order No. 13-2001); *id.* at 18 n.93; TFP Opp'n 21 n.26 (citing IWC Wage Order No. 8-
    2001); Reply 7 (citing IWC Wage Order No. 12-2001). Wage Order No. 8-2001 appears most
23  applicable here because it applies "to all persons employed in the industries handling products
    after harvest," § 1, which industries the same wage order defines to include "any industry,
24  business, or establishment operated for the purpose of grading, sorting, cleaning, drying,
    cooling, icing, packing, dehydrating, cracking, shelling, candling, separating, slaughtering,
25  picking, plucking, shucking, pasteurizing, fermenting, ripening, molding, or otherwise
    preparing any agricultural, horticultural, egg, poultry, meat, seafood, rabbit, or dairy product
26  for distribution, and includes all the operations incidental thereto," § 2(H). Nevertheless, all the
    IWC provisions cited by the parties are worded identically; whether one of these orders or
    another applies does not impact the court's resolution.

1     an employee's regular rate for each workday on which a duty-free meal period was not

2     provided.  Compl. § 49.  They claim damages for these unpaid penalties.  *Id.* ¶ 50.

3           B.     <u>Evidence</u>

4           The plaintiffs rely primarily on depositions and declarations.  Mem. at 16.  In

5     addition to the depositions of the five named plaintiffs, plaintiffs have furnished declarations

6     from more than thirty former TFP employees.  Downey Decl. Exs. 36–68, ECF Nos. 61–63.  In

7     these depositions and declarations, putative class members attest directly to being required to

8     perform work duties off the clock: before shifts, after shifts, and during meal and rest breaks.

9     *See, e.g.*, Angel Decl. ¶¶ 10, 17, Downey Decl. Ex. 37 at 175–77, ECF No. 61.  Such duties

10    included donning and doffing protective equipment and sanitizing equipment and persons.  *See,*

11    *e.g.*, Calderon Decl. ¶¶ 4–17, Downey Decl. Ex. 40 at 2–4, ECF No. 62.

12          Plaintiffs also refer to TFP's various policies, including those in the TFP

13    employee handbook, governing (1) good manufacturing practices (GMPs), Downey Decl.

14    Exs. 5, 6, ECF Nos. 57-4, 57-5; (2) outer garments, *id.* Exs. 7, 8, ECF Nos. 57-6, 57-7; (3) hair

15    and beard nets, *id.* Ex. 9, ECF No. 57-8; and (4) compliance, *id.* Ex. 10, ECF No. 57-9.  These

16    policies were posted in English and Spanish where all employees could see them, *see, e.g.*, Rea

17    Dep. 57:2–11, Downey Decl. Ex. 71 at 10, ECF No. 64, and provided, in part, that "protective

18    equipment, where and when required, must be worn" and that employees must "[w]ash hands

19    thoroughly and sanitize before work and after each absence from the work station . . . ," TFP's

20    Employee Handbook Oct. 2008 §§ 4.2, 5.1, Downey Decl. Ex. 1 at 11, 12, ECF No. 57.

21    Plaintiffs also point to testimony indicating the duration of a break was measured "from when

22    [the employee] left [the] workstation until [the employee] return[ed]."  *See, e.g.*, Angel Decl. ¶

23    10.  "If [the employee returned] late from [the] break," he or she would be disciplined.  *See,*

24    *e.g.*, *id.* ¶ 8.

25    /////

26    /////

C.     Certification

1.     Existence of a Class

Here the proposed general class includes all former and current TFP employees and joint employees who worked during a defined period of time.  Mot. at 1.  Determining who worked for TFP and the codefendants in the specified timeframe is not an inherently unmanageable problem.  Because each subclass includes only a subset of this larger general class, the subclasses are likewise sufficiently ascertainable.

2.     Commonality and Predominance

Rule 23(a) requires "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Such questions exist where class members suffer the same injury, *Falcon*, 457 U.S. at 156, such that simultaneous litigation is productive, *Wal-Mart*, 131 S. Ct. at 2551. "This does not mean merely that [class members] have all suffered a violation of the same provision of law."  *Id.*  Rather, the claims "must depend on upon a common contention" the nature of which "is capable of classwide resolution."  *Id.*  Common litigation must "resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*  Although just one common question could suffice to establish commonality, *id.* at 2556, the true inquiry is into "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation," *id.* at 2551 (emphasis in original) (citation and internal quotation marks omitted).  "Dissimilarities within the proposed class[, however,] . . . have the potential to impede the generation of common answers."  *Id.* (citation and internal quotation marks omitted).

After establishing the existence of common questions of law or fact, the proponent of a putative class must also establish that these questions "predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  "The predominance analysis under Rule 23(b)(3) focuses on 'the relationship between the common and individual issues' in the case and 'tests whether proposed classes are sufficiently cohesive to warrant

12

1    adjudication by representation.'" *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 545 (9th

2    Cir. 2012) (quoting *Hanlon v. Chrysler Corp*, 150 F.3d 1011, 1022 (9th Cir. 1998)).  Some

3    variation is permitted among individual plaintiffs' claims, *Abdullah v. U.S. Sec. Assocs., Inc.*,

4    731 F.3d 952, 963 (9th Cir. 2013), but Rule 23(b)(3) is "more demanding than Rule 23(a),"

5    *Comcast*, 133 S. Ct. at 1432.  Courts are thus required "to take a 'close look' at whether

6    common questions predominate over individual ones," *id.* (citation omitted), "begin[ning] . . .

7    with the elements of the underlying cause of action," *Erica P. John Fund, Inc.* 131 S. Ct. at

8    2184.  Of course, plaintiffs need not show at the certification threshold that predominant

9    questions will be answered in their favor.  *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, ___

10   U.S. ___, 133 S. Ct. 1184, 1196 (2013).  The court considers the merits only to the extent

11   required by Rule 23.  *Id.* at 1194–95 (citing *Wal-Mart*, 131 S. Ct. at 2552 n.6).

12           To prevail on a motion to certify a class under Rule 23(b)(3), the party seeking

13   certification must show: "(1) that the existence of individual injury resulting from the alleged

14   . . . violation . . . [is] capable of proof at trial through evidence that is common to the class

15   rather than individual to its members; and (2) that the damages resulting from that injury [are]

16   measurable on a class-wide basis through use of a common methodology." *Comcast*, 133 S.

17   Ct. at 1430 (citation and internal quotation marks omitted).  "Rule 23(b)(3), however, does *not*

18   require a plaintiff . . . to prove that each elemen[t] of [her] claim [is] susceptible to classwide

19   proof." *Amgen*, 133 S. Ct. at 1197 (emphasis and alterations in *Amgen*) (citation and internal

20   quotation marks omitted).  Similarly, because "'individualized monetary claims belong in Rule

21   23(b)(3),'" "the presence of individual damages cannot, by itself, defeat class certification

22   . . . ." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (quoting *Wal-Mart*, 131

23   S. Ct. at 2558)).

24           In the context of a wage and hour claim, an employer's "uniform . . . policies . . .

25   are relevant to the Rule 23(b)(3) analysis," but a district court may not "rely on such policies to

26   the near exclusion of other relevant factors touching on predominance." *In re Wells Fargo*

13

1   *Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 955 (9th Cir. 2009).  Rather, the court must

2   "consider[] all factors that militate in favor of, or against, class certification."  *Vinole v.*

3   *Countrywide Home Loans, Inc.*, 571 F.3d 935, 946 (9th Cir. 2009) (citation omitted).

4              Here, the plaintiffs complain the defendants uniformly required them to perform

5   off-the-clock, uncompensated labor; specifically, they were required to put on, take off, and

6   clean protective equipment during mandated breaks and before and after shifts.  Considering

7   the depositions of the named plaintiffs and declarations from other former TFP employees, the

8   majority of whom testify to off-the-clock donning, doffing and sanitizing, one common

9   question arises: whether TFP has a policy, unofficial or otherwise, encouraging or requiring

10  such practices.  Although answering this question would not be dispositive as to every class

11  member, it is central to all claims because the existence or absence of a uniform policy would

12  be persuasive evidence.  The same question is "capable of classwide resolution . . . in one

13  stroke," *Wal-Mart*, 131 S. Ct. at 2551, because a company-wide policy would apply to all class

14  members.

15             The plaintiffs propose another common question: whether TFP's status is as a

16  joint employer of the plaintiffs.  Mem. at 18-20.  To determine whether two or more entities are

17  joint employers, courts look primarily to whether the alleged joint employers exercised control

18  over the plaintiffs' working conditions.  *See Martinez v. Combs*, 49 Cal. 4th 35, 75-76 (2010)

19  (resolving joint employer question by looking to "exercising control" factor and "how services

20  are performed").  In the context of the proposed donning and doffing subclass, however, the

21  only relevant control is over when plaintiffs put on, took off, and cleaned protective equipment.

22  To succeed in certifying the subclass, the plaintiffs need to provide evidence of TFP's common

23  policy or practice exerting that control.  Thus, TFP's status as a joint employer is the same

24  common question as the first described above.

25             The plaintiffs have thus presented a satisfactory common issue under Rule 23(a).

26  Rule 23(b)(3) requires that common issue to predominate.  The analysis "begins . . . with the

1   elements of the underlying cause of action." *Erica P. John Fund*, 131 S. Ct. at 2184.  This

2   proposed subclass seeks compensation for its labor, so the plaintiffs must show they performed

3   labor—unpaid donning, doffing and sanitizing—while off the clock.  Whether class members

4   performed labor is a common question because job responsibilities are dictated by company

5   guidelines.  The evidence shows that certain groups of workers were required to comply with

6   certain GMPs, including specified donning, doffing and sanitization practices.  *See* TFP's

7   Employee Handbooks, Downey Decl. Exs. 1–3; TFP's GMPs, Downey Decl. Exs. 5, 6.

8   Whether class members were compensated for that labor, however, is a more difficult

9   determination.

10          The plaintiffs have not presented evidence that TFP had established a written or

11  official uniform policy governing off-the-clock work.  Rather, plaintiffs rely entirely on

12  depositions and declarations from the named plaintiffs and other former TFP employees to

13  make their case.  Despite testimony from several dozen former employees that TFP required

14  off-the-clock donning and doffing, an effectively equal body of testimony from named

15  plaintiffs and putative class members describes on-the-clock donning and doffing.  *See* Def.

16  TFP's App. to Opp. 1006-A, ECF No. 96-1.  Several deponents who testified to donning and

17  doffing off the clock also contradicted themselves, testifying also to doing so on the clock.

18  *Compare, e.g.*, Pena Dep. 62:20–63:03, *with id.* 63:22–25, *and with id.* 64:08–10.  Although

19  these inconsistencies could be accounted for by differences among the applicable time periods,

20  employment divisions, or protective gear, the inquiry nonetheless becomes individualized.

21  Beyond the testimonial inconsistencies, the plaintiffs have not carried their burden to show the

22  predominance of common questions.  Not all employees are required to wear the same

23  protective equipment.  *See* TFP Opp'n at 3 (citing depositions and declarations of putative class

24  members).  Dressing and removing the equipment took place in different locations at different

25  times, required more time of one employee than another, and employees became more efficient

26  over time.  *Id.*

1    Because the issue of compensation is individualized, the plaintiffs' injury cannot

2  be shown via evidence common to the class.  Even if plaintiffs had established the existence of

3  an unofficial policy, in light of such disparate application, each class member would be

4  required to make an individual case to establish the defendants' liability.  The "goals of

5  efficiency and judicial economy" would not be served by certification.  *Vinole*, 571 F.3d at 946.

6  The court need not determine whether the plaintiffs have satisfied the remaining requirements

7  of Rule 23.  Certification is denied as to the donning and doffing subclass.

8    IV.    MIXED HOURLY WORKER SUBCLASS

9          A.    Applicable Law

10    The plaintiffs' first three claims also apply to this subclass.  California law

11  requires an employer to offer its employees certain meal breaks, which may be unpaid: "An

12  employer may not employ an employee for a work period of more than five hours per day

13  without providing the employee with a meal period of not less than 30 minutes."  Cal. Lab.

14  Code § 512(a).  The employer and employee may by mutual consent waive a first meal period

15  on work days of up to six hours and the second meal period for work days of up to twelve

16  hours, if the first meal was not waived.  *Id.*  An employer must only offer a break; it has no

17  duty to "ensure that no work is done."  *Brinker*, 53 Cal. 4th at 1017.  In a claim against an

18  employer, a plaintiff must prove more than the employer's "knowledge of employees working

19  through meal periods"; but "[o]n the other hand, an employer may not undermine a formal

20  policy of providing meal breaks by pressuring employees to perform their duties in ways that

21  omit breaks."  *Id.* at 1040.

22    The Wage Orders and California Labor Code section 226.7 also require an

23  employer to permit its employees to take rest breaks "at the rate of ten (10) minutes net rest

24  time per four (4) hours or major fraction thereof."  *E.g.*, IWC Wage Order No. 5, Cal. Code

25  Regs. tit. 8, § 11080(12)(A).  *See also Brinker*, 53 Cal. 4th at 1028 ("Though not defined in the

26  wage order, a 'major fraction' long has been understood . . . to mean a fraction greater than

16

one-half."). No rest period is required for employees "whose total daily work time is less than three and one-half (3 ½) hours." *E.g.*, IWC Wage Order No. 5, Cal. Code Regs. tit. 8, § 11080(12)(A). An employee may recover one hour of pay for each day on which the employer did not offer a compliant rest break. *Id.* § 11080(12)(B). The plaintiffs allege the defendants did not provide employees with duty-free meal and rest breaks because defendants required employees to return to their work stations "within" thirty minutes or ten minutes, respectively. Mot. at 1-2. Plaintiffs also allege that in some instances the defendants did not offer employees the required breaks at all. *Id.*

B.   <u>Evidence</u>

Plaintiffs point to several iterations of TFP's Employee Handbook. Section 9.3 is consistent across relevant time frames:

> 9.3 Lunch & Break Periods
>
> If your [sic] work more than six (6) hours per day, you will be scheduled for a thirty (30) minute lunch period <u>without</u> pay. Your Supervisor will advise you of the time and length of the lunch period for your shift. You are expected to observe the time limits of the lunch period available to you and return from lunch as scheduled.
>
> If you work a shift of at least four (4) hours, you will receive a 10-minute paid rest period. If you are working a full eight (8) hour shift, you will receive two (2) paid rest periods of 10-minutes each. Employees working more than a ten (10) hour shift will be allowed one additional 10-minute paid rest period. It is very important that you return from your rest period or lunch on time to avoid disciplinary action.

TFP's Employee Handbook Oct. 2008 § 9.3, Downey Decl. Ex. 1 at 19 (2008 Handbook), ECF No. 57; TFP's Employee Handbook Mar. 2009 § 9.3, Downey Decl. Ex. 2 at 19 (2009 Handbook), ECF No. 57-1; TFP's Employee Handbook Oct. 2011 § 9.3, Downey Decl. Ex. 3 at 18 (2011 Handbook), ECF No. 57-2. The Handbook is also printed in Spanish, and the Spanish edition includes the same section. TFP Manual Del Empleado § 9.3, Downey Del. Ex. 4 at 16 (Spanish Handbook), ECF No. 57-3.

1       The Disciplinary Actions Guidelines, section 6.1 of the handbook, in turn

2   references section 9.3 for a violation entitled "[t]ardiness or leaving early."  The Guidelines

3   prescribe a written warning and six months' probation, a two-day suspension without pay or

4   termination for failure to comply with section 9.3.  2008 Handbook § 6.1.16; 2009 Handbook

5   § 6.1.16.  Although this particular provision was deleted from the October 2011 version of the

6   handbook, TFP continued to punish such violations after that date.  *See, e.g.*, Borja Decl.

7   ¶¶ 13–14, Downey Decl. Ex. 39 at 188, ECF No. 61.  TFP also began soliciting, and one

8   witness claims requiring, meal break waivers during the class period.  *See* Meal Break Waiver,

9   Downey Decl. Ex. 16, ECF No 58-4; Laurel Dep. at 44:21-45:2, Downey Decl. Ex. 32 at 137-

10  138, ECF No. 61; Rea Dep. at 74:9–18, Downey Decl. Ex. 71 at 17-22, ECF No. 64; Arriaga

11  Decl. ¶ 8, Downey Decl. Ex. 38, ¶ 8, ECF No. 61.

12      The plaintiffs next direct the court's attention to samples of TFP's time records.

13  Summ. of Kronos Data, Downey Decl. Ex. 17–17D, ECF No. 59.  These records document

14  approximately 94,000 instances after February 2008 in which TFP's timekeeping system

15  recorded its employees punched out and punched in for only one meal-length period when they

16  worked longer than ten hours in a day.  *Id.*; *see* Mem. at 4.  The records also documented

17  approximately 18,000 instances in the same timeframe in which TFP's timekeeping system

18  recorded mid-shift punches-out and punches-in separated by fewer than thirty minutes.  *Id.*  The

19  records also documented approximately 62,000 instances in the same timeframe in which mid-

20  shift punches-out and punches-in did not occur until an employee had been working five hours

21  or more.  *Id.* TFP's timekeeping records did not record rest breaks, and California law does not

22  require TFP to have recorded those breaks.  *E.g.*, IWC Wage Order No. 8-2001, Cal. Code

23  Regs. Tit. 8, § 7(A)(3).

24      TFP employees also testified about meal and rest breaks.  In one deposition,

25  Debra Lacy, TFP's payroll administrator for the relevant locations, testified that the

26  /////

18

timekeeping software did not systematically account for missed second meal breaks when calculating compensation:

> Q: Is there anything programmed into either Kronos or your payroll system which would credit the employee an extra hour or pay on days in which they worked more than 10 hours but there is no—there is no punch-out reflected for a second 30-minute break?
>
> A: There's nothing set up in the system to automatically pay an additional hour, but you also cannot assume that he did not take a second meal period just because there are no punches.

Lacy Dep. 65:10–20, Downey Decl. Ex. 31 at 129, ECF No. 61.  Other deponents testified to the Employee Handbook being distributed to new employees at orientation, Rea Dep. 40:8–11; to an overview of the Employee Handbook being given at employee orientations, Laurel Dep. 35:17–36:1; and to management's expectation that employees "be familiar with the [Employee Handbook's] contents, Rea Dep. 40:12–16.  Further, updates to the Handbook are posted in lunch rooms and "put . . . in [employees'] paychecks."  Laurel Dep. 40:1–20.  Aside from videos not relevant here, the Handbook is the "only policy manual[] used, maintained and/or kept by [TFP's] human resources department," *id.* at 122:17–23.

Finally, as with the donning and doffing subclass, plaintiffs rely on depositions and declarations from the named plaintiffs and other former TFP employees.  *See, e.g.*, Angel Decl. ¶¶ 10, 17.  Nearly all testified to having to perform work duties during meal and rest breaks, not being offered a second meal break during shifts lasting longer than ten hours, not being offered a meal break within five hours of starting a shift, or not being offered a rest break at all.  *See, e.g.*, Calderon Decl. ¶¶ 4–17.

C.    Certification

As an initial matter, the plaintiffs define this subclass to include those who were required to be back at work "within" thirty minutes for meal breaks and "within" 10 minutes for rest breaks.  Mot. 2.  A thirty-minute meal break and a ten-minute rest break are legally compliant meal and rest periods, so the plaintiffs cannot state any claim for class members who

were back at their stations after exactly ten or thirty minutes, as the case may be.  The court

therefore construes the mixed hourly worker subclass definition to include those general class

members who were required to be back at work before thirty minutes for meal breaks and

before ten minutes for rest breaks.  This change does not affect the subclass definition as to

general class members who were "not offered" statutory meal and rest breaks.  *Id.* at 1–2.

                1.    Existence of a Class

Ascertaining membership in this subclass requires no inherently subjective or

unmanageable determination.  Neither is this subclass fail-safe.  A fail-safe class includes only

those individuals who will prevail against the defendant.  *Kamar v. RadioShack Corp.*, 375 F.

App'x 734, 736 (9th Cir. 2010) (unpublished memorandum).  Whether an employer offered a

rest break or required an employee return to work at a specific time is a factual question and

requires no impermissible preliminary determination of liability.

                2.    Numerosity

To be certified, a class must be "so numerous that joinder of all members is

impracticable."  Fed. R. Civ. P. 23(a)(1).  "'[I]mpracticability' does not mean 'impossibility,'

but only the difficulty or inconvenience of joining all members of the class."  *Harris v. Palm*

*Springs Alpine Estates, Inc.*, 329 F.2d 909, 913 (9th Cir. 1964) (quoting *Advers. Specialty Nat.*

*Ass'n v. FTC*, 238 F.2d 108, 119 (1st Cir. 1956)).  Although the Supreme Court has held that

"[t]he numerosity requirement . . . imposes no absolute limitations," *Gen. Tel. Co. of the Nw.,*

*Inc. v. EEOC*, 446 U.S. 318, 330 (1980), courts generally find this requirement satisfied when a

class includes at least forty members, *Rannis v. Recchia*, 380 F. App'x 646, 651 (9th Cir. 2010)

(unpublished) (citing *EEOC v. Kovacevich "5" Farms*, No. 06-165, 2007 WL 1174444, at *21

(E.D. Cal. Apr. 19, 2007)).

            Defendants TFP and AMI do not dispute numerosity.  By TFP's own estimation,

the class includes "more than 4,000 persons who have worked at facilities operated by" TFP.

TFP Opp'n at 1.  SlingShot, however, argues the plaintiffs have not carried their burden

1   because they do not allege which or how many putative class members were SlingShot

2   employees.  SlingShot Opp'n at 5.  The plaintiffs "estimate[] there are in excess of 1,000 class

3   members" but do not allocate their estimate among the defendants.  Mot. at 14.  In the

4   deposition excerpts plaintiffs cite as support for their number, the only reference to SlingShot is

5   as "TFP's current temp[orary worker] agency."  Lopez Dep. 111:23.  Robin Lopez, TFP's

6   30(b)(6)[11] witness regarding organizational structure, testified that TFP has "approximately 400

7   employees" but responded that she did not know "what the grand total would be when you add

8   AMI and SlingShot."  *Id.* at 112:7–14.  At hearing on this motion, plaintiffs' counsel reported

9   they could not currently determine how many of the plaintiffs worked for SlingShot.  Hr'g Tr.

10   28:7–17.  On this basis, because the plaintiffs bear the burden to "prove that there are *in fact*

11   sufficiently numerous parties," *Wal-Mart*, 131 S. Ct. at 2551, the court denies certification of

12   the subclass as to SlingShot.

13              3.    Typicality

14              Rule 23(a) requires the plaintiffs show the representatives' claims and defenses

15   are typical of the class.  Typicality turns on the nature of the claims or defenses asserted, not

16   the facts from which they arise.  *Ellis*, 657 F.3d at 984.  "The purpose of the typicality

17   requirement is to assure that the interest of the named representative aligns with the interests of

18   the class."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted).

19   Accordingly, the representative must be a part of the class, "possess the same interest[,] and

20   suffer the same injury."  *Falcon*, 457 U.S. at 156 (citation and internal quotation marks

21   omitted).  These interests and injuries "need not be substantially identical."  *Hanlon*, 150 F.3d at

22   1020.  Certification may therefore be proper when employees in "different job categories"

23   challenge "practices . . . in the different categories that are themselves similar."  *Dukes v. Wal-*

24   *Mart, Inc.*, 509 F.3d 1168, 1185 (9th Cir. 2007), *rev'd on other grounds*, 131 S. Ct. at 2556–57

25   (2011).

26

---

[11] Fed. R. Civ. P. 30(b)(6).

1          Different plaintiffs describe different experiences here.  Pena testified that in the

2  "fruit and tomato room" she did not receive full thirty-minute meal breaks, Pena Dep. 107:4–8,

3  or second meal breaks on shifts over ten hours, *id.* 105:22–24, but that she received breaks

4  within five hours of beginning her shift, *id.* 110:15–23, and that when she worked in

5  housekeeping, all her breaks were compliant, *id.* 93:10–94:25.  Dail testified that she did not

6  receive full ten-minute rest breaks, Dail Dep. 100:19–101:19, full thirty-minute meal breaks, *id.*

7  112:18–23, or second meal breaks, *id.* 188:24–191:15, but does not claim to have been denied

8  some kind of meal break within the first five hours of her shift and admits to receiving

9  compliant breaks at times, *see, e.g.*, *id.* 144:9–18.  Hernandez testified that she did not receive

10  full ten-minute rest breaks, Hernandez Dep. 216:8–18, full thirty-minute meal breaks, *id.*

11  222:12–23, second meal breaks on shifts over ten hours, *id.* 214:5–21, or a meal break within

12  five hours of beginning her shift, *id.* 71:5–9.  Suarez testified that rest breaks were an

13  uninterrupted fifteen minutes and meal breaks thirty minutes, Suarez Dep. 22:3–11, that she

14  never worked over ten hours, *id.* 22:18–20, and does not claim to have been denied a meal

15  break within the first five hours of her shift.  Morris testified to receiving a full thirty-minute

16  lunch break "every time," Morris Dep. 88:1–14, and a second meal break during shifts over ten

17  hours, *id.* 113:13–14, but not receiving full ten-minute rest breaks, *id.* 184:2–11, or receiving a

18  meal break within the first five hours of his shift, *id.* 89:11–15.

19          Despite their varied experiences, plaintiffs Pena, Hernandez, Dail, and Morris

20  assert claims typical of those allegedly suffered by the second putative subclass.  Although at

21  times the named plaintiffs received legally compliant breaks, they also testified to receiving

22  multiple noncompliant breaks.  The named plaintiffs, excluding Suarez, suffered at least one of

23  the injuries described in the subclass definition.  Dozens of declarations from other former TFP

24  employees attest to the same injuries.  The defendants may not immunize themselves from

25  class action liability by occasionally allowing compliant rest and meal periods.  Plaintiffs Pena,

26  /////

1   Hernandez, Dail and Morris meet the typicality requirement to represent the mixed hourly

2   subclass.

3                   4.       Adequacy

4           Rule 23(a) refers to adequacy of both class representatives and class counsel.

5   *See Falcon*, 457 U.S. at 157 n.13 ("[The adequacy] requirement . . . raises concerns about the

6   competency of class counsel and conflicts of interest."); *Ellis*, 657 F.3d at 985 (resolution of

7   two questions determines legal adequacy: "(1) do the named plaintiffs and their counsel have

8   any conflicts of interest with other class members and (2) will the named plaintiffs and their

9   counsel prosecute the action vigorously on behalf of the class?" (quoting *Hanlon*, 150 F.3d at

10  1020) (internal quotation marks omitted)).  Whether representation is adequate "depends on the

11  qualifications of counsel for the representatives, an absence of antagonism, a sharing of

12  interests between representatives and absentees, and the unlikelihood that the suit is collusive."

13  *Molski v. Gleich*, 318 F.3d 937, 955 (9th Cir. 2003), *overruled on other grounds by Dukes*, 603

14  F.3d at 617 (citation and internal quotation marks omitted).  The adequacy requirement is of

15  constitutional provenance, as "it would violate the Due Process Clause of the Fourteenth

16  Amendment to bind litigants to a judgment rendered in an earlier litigation to which they were

17  not parties and in which they were not adequately represented."  *Richards v. Jefferson Cnty.,*

18  *Ala.*, 517 U.S. 793, 794 (1996).

19          The defendants do not challenge the adequacy of class counsel, and the plaintiffs

20  have submitted evidence of their counsel's relevant experience.  Parris Decl., ECF No. 56-1;

21  Mem. at 21 n.105.  The dispute here instead focuses on the adequacy of the class

22  representatives: their conflicts of interest and credibility.  Conflicts of interest between class

23  members are one object of the Rule 23(a) adequacy inquiry.  *Amchem*, 521 U.S. at 625.  Class

24  members must all possess the same interests.  *Id.* (quoting *East Tex. Motor Freight System, Inc.*

25  *v. Rodriguez*, 431 U.S. 395, 403 (1977)).  In the context of labor law disputes, courts have held

26  that supervisors may not be appropriate representatives of their subordinates.  *See, e.g.*, *Wagner*

23

1   *v. Taylor*, 836 F.2d 578, 595 (D.C. Cir. 1987).  This logic has also been extended to prevent a

2   subordinate from representing a supervisor.  *See Hughes v. WinCo Foods*, No. 11-00644, 2012

3   WL 34483, at *7 (C.D. Cal. Jan. 4, 2012).

4          Here, the proposed class includes all of the defendants' current and former non-

5   exempt hourly-worker employees, Mot. at 1, and therefore encompasses both non-exempt

6   supervisors and their subordinates.  AMI Opp'n at 18.  Plaintiffs do not allege the defendants

7   treated them and their supervisors differently.  Rather, they allege a uniform policy.  If any

8   uniform policy required non-exempt hourly employees to work without compensation, both

9   supervisors and subordinates would have been affected similarly.  In addition, the evidence

10  here does not resemble that in *Hughes*, in which case the plaintiff assigned some of the liability

11  for labor law violations to their supervisors.  2012 WL 34483, at *7.  No conflict is sufficient to

12  call adequacy into question.

13         A class representative's credibility and honesty may also be relevant to his or

14  her adequacy.  *Harris v. Vector Marketing Corp.*, 753 F. Supp. 2d 996, 1015 (N.D. Cal. 2010).

15  An untrustworthy named plaintiff may prevent the represented class members from prevailing

16  on their claims.  *Searcy v. eFunds Corp.*, No. 08-C-985, 2010 WL 1337684, at *4 (N.D. Ill.

17  Mar. 31, 2010).  Not all credibility problems derail a class action.  Jeopardy to the represented

18  class members must be "sharp."  *Harris*, 753 F. Supp. 2d at 1015 (quoting *Lapin v. Goldman*

19  *Sachs & Co.*, 254 F.R.D. 168, 177 (S.D.N.Y. 2008)).  Issues of credibility must be relevant to

20  the litigation, show a conflict of interest, or be objectively confirmed.  *Id.*; *In re Computer*

21  *Memories Sec. Litig.*, 111 F.R.D. 675, 682 (N.D. Cal. 1986); *Kirkpatrick v. Ironwood*

22  *Commc'ns, Inc.*, No. C05-1428JLR, 2006 WL 2381797, at *6 (W.D. Wash. Aug. 16, 2006)

23  (plaintiff with seven felony convictions, including recent convictions for theft and fraud, could

24  not adequately represent the class).  Even then relevant evidence of untrustworthiness or lack of

25  personal integrity is "but one factor" a court must consider.  *Computer Memories*, 111 F.R.D. at

26  682.  The purpose of an investigation into the representative's credibility is not to squelch a

24

1    class action, but to ensure it is prosecuted well and fairly to class members.  For example, in

2    *Harris* the defendant's control over the plaintiff was a "principal question." 753 F. Supp. 2d at

3    1020.  In her deposition the plaintiff testified the defendant controlled her with daily phone

4    calls, but her phone records showed no such calls took place.  *Id.*  For these reasons, among

5    others, the court did not certify the class.  *Id.* at 1023.

6            Here, the plaintiffs face a number of credibility problems.  Plaintiff Dail

7    reported three felony convictions in Oregon in 2005, two for drug possession and one for

8    identity theft.  Supplemental Responses to Form Interrogatories, Hansen Decl. Ex. 77, at 2,

9    ECF No. 93-8.  Dail had originally estimated these convictions occurred in 1999 or 2000, and

10   did not at first disclose the identity theft conviction.  Responses to Form Interrogatories,

11   Hansen Decl. Ex. 76, at 4, ECF No. 83-8.  A conviction for possession of narcotics is not

12   directly relevant to the wage and hour claims the plaintiffs assert here, does not prove

13   dishonesty, and does not "automatically disqualify" her.  *Kirkpatrick*, 2006 WL 2381797, at *6.

14   Her conviction for identity theft, however, required proof of her "intent to deceive or to

15   defraud."  Or. Rev. Stat. § 165.800(1); *State v. Porter*, 198 Or. App. 274, 277 (2005).  This

16   conviction and her initial failure to disclose the conviction is likely to cast doubt on her honesty

17   and credibility, and occurred near the time period relevant to her claims.  *See* Responses to

18   Form Interrogatories, Hansen Decl. Ex. 76, at 4, ECF No. 83-8; Supplemental Responses to

19   Form Interrogatories, Hansen Decl. Ex. 77, at 2, ECF No. 93-8.  Dail is not an adequate

20   representative.

21           Plaintiff Hernandez offered contradictory testimony about the length of her meal

22   breaks.  In her deposition she first testified she had never taken a lunch or meal period away

23   from the production line for longer than thirty minutes.  Hernandez Dep. 101:21-24.  Later,

24   when confronted with timesheets at her deposition, she acknowledged she had once been

25   punched out for thirty-two minutes and once for thirty-one minutes over the course of her

26   employment.  *Id.* at 138:18–139:19.  She could not remember whether she had been disciplined

1    for these breaks.  *Id.*  This testimony is directly relevant to the plaintiffs' claims.  But this

2    evidence shows nothing more than that Hernandez took two longer breaks, both only one or

3    two minutes longer than thirty minutes, and does not render her so untrustworthy as to be an

4    inadequate representative.

5           Plaintiffs Morris and Pena face less strong challenges to their credibility.  Morris

6    admitted he had been convicted of a misdemeanor, but did not specify the nature of the offense.

7    Morris Dep. at 9:13-11:15.  He also admitted he was dishonorably discharged from military

8    service, but could not recall on what grounds.  Morris Dep. 19:07-20:06.  The evidence before

9    the court is sketchy and not directly relevant to the plaintiffs' claims.  Plaintiff Pena admitted

10   she did not have a social security number, but signed an employment application for AMI and

11   provided a social security number that did not belong to her.  Pena Dep. at 10:21-24, 21:12-

12   22:14, 24:04-06.  Although this act involved misrepresentation, it did not "aris[e] out of or

13   touch[] upon the very prosecution of the lawsuit," *Jane B. by Martin v. New York City Dep't of

14   Soc. Servs.*, 117 F.R.D. 64, 71 (S.D.N.Y. 1987); although related to her employment, it is not

15   related to her claims here, *see Harris*, 753 F. Supp. 2d at 1015–16, 20 (finding that an

16   employee's dubious testimony of her employer's control jeopardized only her adequacy with

17   respect to claims that required her employer's control as a "key factor," but not to claims for

18   which control was irrelevant).

19          The defendants also challenge plaintiff's Suarez's credibility, but because her

20   claims are not typical of this (or any) subclass, the court does not consider the challenge.  The

21   defendants also make much out of other apparent contradictions between all of the plaintiffs'

22   deposition testimony and their damages claims.  TFP Opp'n at 18-19; Hansen Decl. Ex. 1006-

23   O at 1-7, ECF No. 96-15.  These contradictions are not so stark as to jeopardize the class's

24   success and are more fittingly addressed in the context of typicality and Rule 23(b)(3).  In

25   summary, Pena, Hernandez, Morris, and their counsel are adequate representatives under Rule

26   23(a).

5.      Commonality and Predominance

The court first evaluates evidence that the defendants subjected the plaintiffs to a common, unlawful policy and whether the policy reflected workplace reality.  It then evaluates whether the plaintiffs have met their burden to show common issues of law and fact exist and predominate with respect to each alleged violation of California labor law.

a)      Existence of a Common Policy

As noted, TFP has produced several versions of its handbook.  2008 Handbook § 9.3; 2009 Handbook § 9.3; 2011 Handbook § 9.3; Spanish Handbook § 9.3.  Questions of a written, company-wide policy, as can be contained in an employee handbook, are often common because they apply to employees generally.  *See In re Wells Fargo*, 571 F.3d at 957 ("An internal policy that treats all employees alike . . . suggests that the employer believes some degree of homogeneity exists among the employees.  This undercuts later arguments that the employees are too diverse for uniform treatment.").  Here, unlike the first donning and doffing subclass, there is no question whether a policy exists; it does, as written in the handbooks.  Rather, the question is whether the official policy is sufficient to establish liability.  The plaintiffs allege harm from four violations of California law regarding meal and rest breaks:  (1) failure to offer a meal break within five hours of the beginning of a shift; (2) failure to offer a second meal break on shifts lasting ten hours or more; (3) failure to offer at least two rest breaks on shifts lasting between eight and ten hours; and (4) as construed by the court, failure to allow employees a complete ten-minute or thirty-minute break before requiring they return to work.  Mem. at 1–2.

The plaintiffs have described common issues of law and fact as to the first three violations alleged within this subclass.  Regarding the first alleged violation, the Handbook provided for "a thirty (30) minute lunch period without pay" if employees "work[ed] more than six (6) hours per day."  *E.g.*, 2008 Handbook § 9.3.  It informed employees a supervisor would "advise [them] of the length and time of the lunch period . . . ."  *Id.*  This policy did not comply

27

1   with California law, which requires, absent waiver, "[a]n employer may not employ an

2   employee for a work period of more than five hours per day without providing the employee

3   with a meal period of not less than 30 minutes."  Cal. Lab. Code § 512(a).  As to the second

4   alleged violation, the Handbook provided for "one additional 10-minute paid rest period" after

5   ten hours of work, *e.g.*, 2008 Handbook § 9.3, and not an additional thirty-minute meal period

6   as required under California law, Cal. Lab. Code § 512(a).  Regarding the third alleged

7   violation, the Handbook's policy prescribes two ten-minute rest periods during shifts exceeding

8   eight hours, 2008 Handbook § 9.3, nearly but not fully complying with California law, *see, e.g.*,

9   IWC Wage Order No. 8, Cal. Code Regs. tit. 8, § 11080(12)(A) (requiring an employer to

10  permit its employees to take rest breaks "at the rate of ten (10) minutes net rest time per four

11  (4) hours or major fraction thereof."); *see also Brinker*, 53 Cal. 4th at 1028 ("Though not

12  defined in the wage order, a 'major fraction' long has been understood . . . to mean a fraction

13  greater than one-half.").  A compliant policy would prescribe two ten-minute breaks for shifts

14  longer than six hours and up to ten hours long.

15          Beyond TFP's Handbooks, the court also finds the existence of a waiver policy

16  under California Labor Code § 512(a) to satisfy commonality.  The evidence suggests that,

17  despite failing to provide second meal breaks, TFP did not ask employees to sign waivers until

18  midway through the class period in 2012.  *See* Meal Break Waiver, Downey Decl. Ex. 16, ECF

19  No 58-4; Laurel Dep. at 44:21-45:2, Downey Decl. Ex. 32 at 137-138, ECF No. 61; Rea Dep.

20  at 71:25-76-9, Downey Decl. Ex. 71 at 17-22, ECF No. 64; Arriaga Decl. ¶ 8, Downey Decl.

21  Ex. 38 at 180, ECF No. 61.  That TFP did not obtain waivers for about three years is a common

22  issue of fact.  The plaintiffs have cited only one declaration to show TFP later maintained a de

23  facto policy to require, rather than merely offer, meal break waivers.  Arriaga Decl. ¶ 8,

24  Downey Decl. Ex. 38 at 180, ECF No. 61.  The existence of such a policy is a common

25  question, although not yet resolved.

26  /////

1    As to the fourth alleged violation, the Handbook does not require employees to

2 return to their stations before the end of a ten minute or thirty-minute break.  No common

3 question exists as to this final alleged violation based on the TFP Handbooks.  The plaintiffs,

4 however, have also put forward their analysis of TFP's digital timestamp records.  Summ. of

5 Kronos Data, Downey Decl. Ex. 17–17D, ECF No. 59.  These records show several thousand

6 instances in which employees' punches-out and punches-in were separated by fewer than thirty

7 minutes for meal breaks.  *Id.*; Mem. at 4.  The records do not speak to rest breaks.  In the

8 absence of a TFP policy requiring rest and meal breaks be shorter than the required lengths,

9 however, timekeeping records alone do not present a common issue, or its predominance, here.

10 *Ordonez v. Radio Shack, Inc.*, No. 10-7060, 2013 WL 210223, at *7 (C.D. Cal. Jan. 17, 2013).

11 Finally, to the extent common questions arise from an alleged uniform policy requiring

12 uncompensated donning, doffing, and sanitizing, the analysis in the previous section applies

13 and prevents certification.  *See supra* section III.C.2.  Certification of the fourth claim of

14 incomplete break periods is denied.

15                              b)      Predominance of a Common Policy

16    Having established the existence of at least one common issue, Rule 23(b)(3)

17 requires that issue predominate over the individualized questions of law and fact.  The court

18 must direct its analysis to each claim and its elements in turn.  *See Erica P. John Fund*, 133 S.

19 Ct. at 2184.  But a common thread may be addressed before beginning a claim-by-claim

20 analysis: whether the common issues arising from TFP's Handbook and waiver practice (or

21 lack thereof) actually predominate in light of evidence the policy was not uniformly

22 implemented.  This is because company rules "suggest a uniformity among employees that is

23 susceptible to common proof" only if the rules "reflect the realities of the workplace."  *In re

24 Wells Fargo*, 571 F.3d at 958–59.  Ignorance of "other relevant factors touching on

25 predominance" would reflect an abuse of discretion.  *Id.* at 955.

26 /////

29

1        TFP personnel have testified that the Handbook embodied official policy and

2   was distributed to employees.  *See* Rea Dep. 40:8–11 ("Q. Do you know what department

3   distributes this handbook to employees? A. HR. Q. Do you know when it's given to

4   employees? For example, at orientation or at the time they interview? A. As far as I know,

5   when we have new employees, they're handed one of these [the Handbook] at orientation.");

6   Laurel Dep. 35:17–36:1 (TFP gives new employees an overview of the Handbook at orientation

7   sessions), 40:1–20 (TFP distributes updates to the Handbook in employees' paychecks and in

8   lunchrooms), 122:17–23 (TFP uses, keeps, and maintains only the Handbook).  Several

9   employees, including the plaintiffs, testified however that TFP did not implement or rely on the

10  Handbook.  Plaintiff Suarez testified "the production room and what the handbook says don't

11  have a whole lot in common" because the Handbook's rules contradicted "how you should

12  follow the rules in production"; an employee couldn't learn from the Handbook "what it was to

13  the production part."  Suarez Dep. 141: 7–15.  She testified employees would not take breaks at

14  the "exact time" specified in the Handbook.  *Id.* at 142: 2–6.  Plaintiff Morris testified that he

15  followed the rules in the Handbook, but TFP did not, Morris Dep. 146:22–147:2, and that when

16  his supervisor's instructions differed from those in the Handbook, he obeyed his supervisor, *id.*

17  at 147:3-16.  Other TFP employees testified TFP did not follow the Handbook in practice.

18  Hansen Decl. Ex. 56, at 10-12, Heywood Dep. 63:13-65:12.  The court has not located, and the

19  plaintiffs have not provided, any testimony by a putative class member that TFP implemented

20  the policy of denying required meal and rest breaks exactly as set forth in its Handbook.

21        TFP's timekeeping records shed some light on deponents' differing views.  *See*

22  Summ. of Kronos Data, Downey Decl. Ex. 17–17D.  These records include several thousand

23  timekeeping data points consistent with the meal break policies described in the Handbook.

24  The timekeeping data do not disclose when employees took rest breaks and therefore cannot

25  resolve whether TFP's Handbooks accurately describe whether TFP actually offered putative

26  class members rest breaks. Whether an employee was relieved of duty during any full ten

30

1   minute period will require an individual inquiry that the timekeeping records cannot simplify.

2   And without these records, only contradictory testimony about TFP's rest break policy remains.

3   Certification of the rest break claims must be denied.

4          As noted, the timekeeping records do record meal breaks, many of them shorter

5   than thirty minutes, and many of them later than required by law.  Even if alternative

6   explanations for these timestamp data exist, as defendants argue, the data do not stand alone.

7   TFP distributed the Handbook to all new employees at their orientation.  That Handbook

8   expressed a policy that did not comply with California law.  Although a number of TFP

9   employees testified they did not follow the Handbook strictly, a broad sample of TFP's

10  timekeeping records is consistent with the policy expressed in the Handbook.  Any "individual

11  variation will not defeat class certification."  *Munoz v. Giumarra Vineyards, Corp.*, No. 09-

12  0703, 2013 WL 2421599, at *10 (E.D. Cal. June 3, 2013); *cf. Escano v. Kindred Healthcare*

13  *Operating Co., Inc.*, No. 09-04778, 2013 WL 816146, at *9 (C.D. Cal. March 5, 2013) (data-

14  driven analysis might overcome differences between employees).

15         Additionally, because California law only requires the defendants to have

16  offered compliant meal breaks, and does not deputize them to prevent employees from working

17  at all during meals, *Brinker*, 53 Cal. 4th at 1017, determination of the defendants' liability will

18  not require the finder of fact to delve into the circumstances of a particular meal break to

19  deduce whether one defendant or another prevented each putative class member employee from

20  doing work.

21         Because TFP's common meal break policy, as described in its Handbook, and its

22  waiver practices supersede the need for individual inquiries, the court now considers, for each

23  of the two meal claims within this subclass, whether the common issues "predominate over any

24  question affecting only individual members."  Fed. R. Civ. P. 23(b)(3).

25  /////

26  /////

1                     c)      <u>First Meal Breaks</u>

2        As also reviewed above, the California Labor Code provides, "[a]n employer

3 may not employ an employee for a work period of more than five hours per day without

4 providing the employee with a meal period of not less than 30 minutes, except that if the total

5 work period per day of the employee is no more than six hours, the meal period may be waived

6 by mutual consent of both the employer and employee." Cal. Labor Code § 512(a). To

7 succeed, a plaintiff must therefore show (1) he or she worked longer than five hours; (2) the

8 defendants did not offer him or her a thirty-minute meal period; and (3) no waiver applied.

9        Whether an employee worked longer than a five-hour shift will be an

10 individualized inquiry. There is no evidence before the court that certain workers were

11 regularly scheduled for such shifts. Defendants argue the subclass also encompasses

12 employees in a wide variety of positions performing dozens of tasks. TFP Opp'n at 1-2. Some

13 work in teams and must take breaks together, others do not. *Id.* at 2. Supervisors manage

14 employees differently and may change from one day to the next. *Id.* Nevertheless, to the

15 extent available, timekeeping records will provide a common means of proof and mitigate the

16 individual nature of this first inquiry. Whether the defendants offered the plaintiffs a meal

17 period involves a predominantly common question.

18        TFP's policy, as described in its Handbook, was to grant employees a lunch

19 break if they worked more than six hours per day, which did not comply with California law.

20 The Handbook also warns that failure to comply with section 9.3 will subject an employee to

21 discipline, up to and including termination. 2008 Handbook § 6.1.16. Again, as described

22 above, the timekeeping evidence corroborates the policy described in the Handbook. Finally,

23 the existence or non-existence of a waiver depends on TFP's waiver policy at the relevant

24 times. Before it began soliciting waivers, TFP had a de facto policy not to obtain them; after it

25 began soliciting waivers, the question remains unresolved whether TFP uniformly required

26 waivers.

1  Whether TFP had a uniform policy to require waivers when it began to solicit them may be

2  established in part by common proof, but the plaintiffs have not provided that proof.

3                A comparison of individual and common questions shows common questions

4  predominate.  The first inquiry, into the length of a shift, is individualized, but subject to

5  common determination by resort to the timekeeping records.  Common issues predominate as

6  to the second question, whether the defendants offered a break, but perhaps not the third of

7  waiver.  The inquiry into whether a lawful meal period was offered goes to liability, whereas

8  answers to individual questions would only serve to vary damages.  In this Circuit,

9  individualized determinations of damages do not alone stymie a class action.  *Leyva*, 716 F.3d

10  at 513-14.  Class members will be able to demonstrate through common proof, namely the

11  existence and implementation of a noncompliant official policy, liability for their individual

12  injuries.  Damages may also be susceptible to calculation through a common methodology on

13  the basis of time records such as those already produced.  Availability of timesheets and ease of

14  damages calculations are relevant considerations and weigh in favor of class certification.

15  *Munoz*, 2013 WL 2421599, at *8; s*ee also Local Joint Exec. Bd. of Culinary/Bartender Trust*

16  *Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001) (considering the ease of

17  damages calculations).  If the defendants ultimately dispute the accuracy of the plaintiffs'

18  interpretation of the records, or the records' completeness, they may subject the data to a

19  rigorous analysis, but such an analysis would remain common to all employees.

20             d)    <u>Second Meal Breaks</u>

21                Also under the California Labor Code, "[a]n employer may not employ an

22  employee for a work period of more than 10 hours per day without providing the employee

23  with a second meal period of not less than 30 minutes, except that if the total hours worked is

24  no more than 12 hours, the second meal period may be waived by mutual consent . . . ."  Cal.

25  Lab. Code § 512(a).  Thus, a plaintiff must show that he or she (1) worked a shift of ten hours

26  or more in one day; (2) was not offered a second meal period of at least thirty minutes; and (3)

1    no waiver applied.  The predominance analysis here parallels that performed on first meal

2    breaks, and common issues likewise predominate.

3                      e)      Summary

4              Of the four alleged violations made on behalf of the second subclass, the first

5    two meal break claims support class certification:  (1) failure to offer a meal break within five

6    hours of the beginning of a shift; and (2) failure to offer a second meal break on shifts lasting

7    ten hours or more.  Common questions do not predominate as to the third and fourth claims, of

8    rest break violations and complete ten and thirty minute breaks.  Certification is denied as to

9    them.

10             6.      Superiority

11             Predominance of common questions does not alone justify use of a class action,

12   "for another method of handling the [case] may be available which has greater practical

13   advantages."  Fed. R. Civ. P. 23(b)(3) advisory committee's note.  Rule 23(b)(3) requires a

14   court find a class action is the "superior" method of resolution.  *Id.*  This constraint is meant to

15   lead to court "to assess the relative advantages of alternative procedures for handling the total

16   controversy."  *Id.*  Rule 23(b)(3) provides that superiority is determined by considering, for

17   example,

18                  (A) the class members' interests in individually controlling the
                    prosecution or defense of separate actions;
19

20                  (B) the extent and nature of any litigation concerning the
                    controversy already begun by or against class members;

21                  (C) the desirability or undesirability of concentrating the
                    litigation of the claims in the particular forum; and
22

23                  (D) the likely difficulties in managing the class action.

24   *Id.*; *see also Zinser v. Accuflix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001).

25             The Supreme Court has acknowledged that Rule 23(b)(3) contemplates the

26   "vindication of the rights of groups of people who individually would be without effective

34

1    strength to bring their opponents into court at all." *Amchem*, 521 U.S. at 617 (citation and

2    internal quotation marks omitted).  "The policy at the very core of the class action mechanism

3    is to overcome the problem that small recoveries do not provide the incentive for any individual

4    to bring a solo action . . . .  A class action solves this problem by aggregating the relatively

5    paltry potential recoveries . . . ." *Id.*

6              The court first assesses the proposed subclasses against the factors described in

7    Rule 23(b)(3).  Regarding the first factor, "the class members' interests in individually

8    controlling the prosecution or defense of separate claims," Fed. R. Civ. P. 23(b)(3)(A), when

9    smaller dollar amounts are in controversy, this factor generally favors certification. *Zinser*,

10   253 F.3d at 1190–91.  Large, complex claims do not fit so well in a class as do smaller, simpler

11   claims.  *See id.*  Resolution of this factor takes into account the policy of incentivizing

12   legitimate claims even when individual damages are modest.  *Amchem*, 521 U.S. at 617.  Here

13   the plaintiffs assert relatively small individual claims for meal and rest break and waiting time

14   violations.  Pena estimates damages arising from meal break and waiting time violations of less

15   than $16,168.[12]  Hernandez estimates damages for the same violations of less than $5,528.[13]

16   Morris estimates damages arising from meal break violations equal to $224.[14]  These small

17   claims do not make individual litigation attractive or sustainable, especially when success will

18   require analysis of large volumes of electronic timekeeping data.  The plaintiffs also note, and

19   the defendants do not dispute, that many putative class members are non-native speakers of

20

21              [12] Pena alleges damages of $13,464 arising from meal and rest break violations on days
     shorter than ten hours, damages of $544 for days ten hours or longer, and damages of $2,160
22   arising from waiting time penalties. Plaintiff Pena's Amended Responses to TFP's Form
     Interrogatory, Hansen Decl. Ex. 71 at 2–3, ECF No. 93-8.
23
24              [13] Hernandez estimates damages equal to $3,216 arising from meal and rest break
     violations on days shorter than ten hours, damages equal to $152 arising from meal break
     violations on days ten hours or longer, and waiting time penalty damages equal to $2,160.
25   Hansen Decl. Ex. 72 at 2–3, ECF No. 93-8.

26              [14] Morris estimates damages equal to $216 for meal break violations on days shorter
     than ten hours and $8 dollars of damages for meal break violations on days ten hours or longer.
     Hansen Decl. Ex. 75 at 2–3, ECF No. 93-8.

1    English who lack familiarity with American law and lack the resources to finance and direct

2    individual suits.  This consideration weighs in favor of certification.

3            The second factor, the "extent and nature of any litigation concerning the

4    controversy already commenced by or against members of the class," Fed. R. Civ. P.

5    23(b)(3)(B), is meant to "assur[e] judicial economy and reduc[e] the possibility of multiple

6    lawsuits." *Zinser*, 253 F.3d 1180, 1191 (quoting 7A Charles Alan Wright et al., *Federal*

7    *Practice and Procedure* § 1780 at 568–70 (2d ed. 1986)).  Here the parties have not described,

8    and the court is not aware of any other related litigation.  This factor does not preclude

9    certification.

10           The third factor is "the desirability or undesirability of concentrating the

11   litigation" in this forum.  Fed. R. Civ. P. 23(b)(3)(C).  Here, the plaintiffs do not reside in

12   multiple jurisdictions, and only one set of substantive law applies: California labor law.  The

13   events giving rise to this litigation occurred at the defendants' Tracy, California processing

14   plants, which are located within this district.  This factor favors certification.

15           The fourth factor weighs the "likely difficulties in managing the class action."

16   Fed. R. Civ. P. 23(b)(3)(D).  The plaintiffs propose to conduct trial in two phases: the first to

17   determine liability, and the second to determine damages.  Mem. at 24–25.  In the first phase,

18   they expect to try questions such as the existence and uniform application of TFP's meal

19   policy, whether TFP's timekeeping records are accurate, and whether the defendants paid

20   complete final paychecks.  *Id.*  In the second phase, they propose to determine how many

21   violations occurred and in what amount paychecks fell short of the California Labor Code.  *Id.*

22   This second phase will likely pose greater management challenges.  The plaintiffs' proposal to

23   rely on statistical sampling of claims may not be realistic.  *Cf. Wal-Mart*, 131 S.Ct. at 2561

24   (disapproving of a sampling method to determine damages in a class action for back pay).

25   Nevertheless, individualized damages questions are not fatal to certification; they may be

26   susceptible of reasonable focus during trial, and are less daunting in the presence of

36

1   timekeeping data.  *Leyva*, 716 F.3d at 513–14; *Local Joint Exec. Bd.*, 244 F.3d at 1163.  As

2   noted, the defendants remain free to attack the reliability and applicability of any data.

3   Defendants have not effectively rebutted the workability of plaintiffs' overall trial plan, but

4   rather only demand a more detailed proposal and criticize the plaintiff's reliance on a "trial by

5   formula" approach.  *See* TFP Opp'n 22–23.

6           On balance, application of the four factors suggests a class action is the superior

7   means to try the common questions of law and fact that predominate here.  The Ninth Circuit

8   has also required district courts to consider alternative means of litigating a proposed class

9   action.  *See Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234–35 (9th Cir. 1996) ("A class

10  action is the superior method for managing litigation if no realistic alternative exists.").  In

11  particular, individual litigation, joinder, multidistrict litigation, or an administrative or other

12  non-judicial solution may be superior.  *See* 7A Charles A. Wright, et al., *Federal Practice &*

13  *Procedure* § 1779 (3d ed. 2005).  For the reasons described in the previous paragraphs,

14  individual litigation is unlikely to present the plaintiffs a viable means of recovery.  The

15  number of potential plaintiffs, as many as four thousand, also makes joinder impracticable.

16  Multidistrict litigation would not present any advantage, as all the relevant events and evidence

17  occurred and exists in this district.  And finally, although the defendants point to one potential

18  class member's effective use of California administrative remedies, TFP Opp'n at 28:11–13,

19  this lone success does not show administrative remedies are appropriate for the putative class at

20  large.  The court is unaware of any other alternative available at this time, although it will of

21  course require the parties to report to it on mediated alternatives at a later date.

22  V.    WAITING TIME PENALTIES SUBCLASS

23        A.    Applicable Law

24           The plaintiffs' fifth claim applies to this subclass.  Section 201(a) of the

25  California Labor Code provides, as a general rule, that "[i]f an employer discharges an

26  employee, the wages earned and unpaid at the time of discharge are due and payable

1    immediately." Cal. Lab. Code § 201(a). Section 202(a) provides, as a general rule, that if an

2    employee resigns, wages become due seventy-two hours later, unless the resigning employee

3    gives seventy-two hours' notice, in which case wages are due immediately. *Id.* § 202(a).

4    Section 203(a) provides that if an employer "willfully fails to pay" as required by sections

5    201(a) and 202(a), "the wages of the employee shall continue as a penalty from the due date

6    thereof at the same rate until paid or until an action therefor is commenced" for up to thirty

7    days. *Id.* § 203(a). The plaintiffs claim the defendants did not pay them all wages due on their

8    last day if they were fired, or within seventy-two hours if they resigned.

9        B.   <u>Evidence</u>

10           Plaintiffs take the position their fifth waiting time claim is premised on the

11   failure to pay all wages due. *See* Def.'s Mot. to Dismiss Hr'g Tr. 13:9–18:17, ECF No. 50

12   ("[The plaintiffs do not argue] about trying to go back in time and figure out how many days"

13   elapsed between the time plaintiff Hernandez "was no longer employed and the time she got

14   the paycheck"; rather, they argue putative class members "got a final paycheck, and the final

15   payment check did not include all the wages owed."); Mem. at 17 ("In this action, Plaintiffs did

16   not receive all of the wages owed for[] missed meal periods and donning protective gear before

17   shifts and during meal and rest breaks."); *id.* at 21 ("All plaintiffs were uniformly shorted in

18   their final pay checks as TFP deliberately failed to pay owing meal and rest break premiums.");

19   *id.* at 23 ("Waiting time penalties will survive or perish based on this court's conclusions

20   concerning legally non-compliant meal and rest breaks and pre-production donning time."). In

21   this respect, the waiting time subclass is derivative of the first two subclasses and contingent

22   upon the same evidence.

23           The proposed class definition, however, is not entirely derivative because it also

24   includes general class members who "did not . . . receive their final paychecks on a timely

25   basis." Compl. ¶ 5(D). The complaint includes allegations plaintiffs Pena, Hernandez, and Dail

26   did not receive their final paychecks within the time period required by the California Labor

1   Code.  Compl. ¶¶ 24, 25, 27 (citing Cal. Lab. Code §§ 201-203).  Plaintiff Hernandez testified

2   she did not immediately receive her final paycheck.  Hernandez Dep. 152:4-156:14.  The

3   plaintiffs provide declarations of two other putative class members who say they did not

4   receive paychecks within the periods required by the Code.  Aguirre Decl., Downey Decl. Ex.

5   36, at 3 ¶¶ 21-22, ECF No. 61; Rocha Decl., Downey Decl. Ex. 61, at 1 ¶ 5, ECF No. 63.  But

6   plaintiffs have not cited any evidence, and the court has located none, that shows plaintiff Pena

7   did not timely receive her final paycheck.  And plaintiff Dail testified she received her final

8   paycheck at the time she was terminated.  Dail Dep. 185: 3-9.

9         C.      Certification

10          The third waiting time subclass includes those who did not receive their

11   paychecks by a certain date or who did not receive all money due.  Ascertaining membership in

12   this subclass requires no inherently subjective or unmanageable determination, and the subclass

13   is not fail-safe because membership depends on only factual inquiries.  The plaintiffs have also

14   shown the class is sufficiently numerous, except as to SlingShot.

15          Whether the plaintiffs' claims are typical of this proposed class requires a

16   careful distinction between its derivative and non-derivative portions.  The waiting time

17   subclass is partially derivative of the first two subclasses, so the class representatives' claims

18   are typical of the waiting time subclass to the same extent their claims are typical of those in

19   the first two subclasses.  The court has denied certification of the first donning and doffing

20   subclass, so only Pena, Hernandez, and Dail could meet the typicality requirement because only

21   their claims are typical of the second subclass.  Although Morris's claims are also typical of

22   those of the second mixed hourly subclass, because his waiting time claim has previously been

23   dismissed, Order 18, ECF No. 76, he may not be a representative for this subclass.  Adequacy

24   is likewise determined here derivatively; therefore, Pena and Hernandez are adequate

25   representatives of this subclass, because they and their counsel are adequate representatives of

26   the second subclass.

To the extent the subclass is not derivative, the plaintiffs have submitted evidence that Hernandez was the only proposed class representative who did not receive her final paycheck within the statutory period.  Because Hernandez alleges she was terminated, Compl. ¶ 25, she can assert a claim only under section 201 of the California Labor Code, requiring immediate payment upon discharge.  Only plaintiff Hernandez could be typical of the non-derivative waiting time subclass, and certification could only be proper under section 201.  But plaintiff Hernandez's experience is atypical of the putative subclass: she left the country to care for her ailing father and received a final paycheck upon her return. Compl. ¶ 25; Hernandez Dep. 152:4-156:14.  The plaintiffs have cited only one declaration of a putative subclass member who was terminated and did not receive her paycheck the same day.  Rocha Decl., Down Decl. Ex. 61, at 1 ¶ 5, ECF No. 63.  Leticia Rocha was terminated by phone at lunch.  *Id.*  Because plaintiff Hernandez's experience is not typical, certification of any non-derivative waiting time subclass must be denied.  The court declines to substitute Rocha or another putative class member as named plaintiff *sua sponte*, but as described below, the court denies certification without prejudice, with conditions.

Moreover, the plaintiffs have not provided sufficient evidence that common issues exist or predominate as to the non-derivative portion.  The plaintiffs do not allege TFP employed a uniform practice or policy to issue untimely final paychecks, nor do they provide evidence of such a practice or policy.  An individualized evaluation of the circumstances of each termination or resignation thus would be necessary to determine the defendants' liability.

Because the claims of this subclass that may proceed are entirely derivative of the meal break claims of the mixed hourly worker subclass, they meet or fail to meet the commonality and predominance requirements to the same extent.

/////

1    Class litigation is also superior for the same reasons described above in the

2    discussion of the second subclass.  The waiting time subclass is certified as a derivative of the

3    mixed hourly worker subclass, with Pena and Hernandez as class representatives.

4    VI.    WAGE STATEMENT SUBCLASS

5           A.    Applicable Law

6    The plaintiffs' sixth claim applies to this fourth subclass.  Employers must

7    include certain information with paychecks, including, for example, wages earned, hours

8    worked, all deductions, the dates of the pay period, the employer's name and address, and all

9    applicable hourly rates.  Cal. Lab. Code § 226(a).  The plaintiffs allege the defendants did not

10   include the required information on paychecks.  California law requires only a "very modest

11   showing" of injury in a claim under this provision of the California Labor Code.  *Jaimez v.*

12   *DAIOHS USA, Inc.*, 181 Cal. App. 4th 1286, 1306 (2010).  *See also Escano v. Kindred*

13   *Healthcare Operating Co., Inc.*, No. 09–04778, 2013 WL 816146, at *11 (C.D. Cal. Mar. 3

14   2013) ("[T]he injury requirement should be interpreted as minimal in order to effectuate the

15   purpose of the wage statement statute; if the injury requirement were more than minimal, it

16   would nullify the impact of the requirements of the statute.").

17          B.    Evidence

18   In support of the proposed wage statement subclass, plaintiffs present three

19   documents: (1) a TFP wage statement issued to plaintiff Hernandez dating from January 2009,

20   TFP Wage Statement, Downey Decl. Ex. 12, ECF No. 58-1; (2) an AMI wage statement issued

21   to plaintiff Pena dating from June 2009, AMI Wage Statement, Downey Decl. Ex. 13, ECF

22   No. 58-2; and (3) an exemplar of a legally compliant wage statement taken from the California

23   Department of Industrial Relations website, Wage Statement Example, Oliver Decl. Ex. HH, at

24   30, ECF No. 56-3.  In opposition to TFP's motion for summary judgment, however, plaintiffs

25   Pena, Hernandez, and Dail conceded their wage statement claims were time-barred and only

26   plaintiffs Morris and Suarez could assert timely claims.  Pls.' Opp'n TFP Mot. Summ. J.

1  18:4-5, ECF No. 168.  The court therefore granted TFP's motion for summary judgment as to

2  any wage statement claims by plaintiffs Pena, Hernandez, and Dail.  Order 10, ECF No. 199.

3      C.      Certification

4          The plaintiffs have not provided sufficient evidence to allow certification of this

5  subclass.  Although the TFP wage statement lacks the hourly pay rate and is therefore deficient

6  under California Labor Code section 226(a), the plaintiffs have offered only one wage

7  statement, issued to plaintiff Hernandez, Downey Decl. Ex. 12, ECF No. 58-1.  Because they

8  have shown only that plaintiff Hernandez received a non-compliant wage statement, for

9  purposes of this motion, only she could have suffered an injury typical of the wage statement

10  subclass.  Even if Hernandez's claims were typical and she would be an adequate

11  representative, her one paystub is insufficient to meet plaintiffs' burden.  They have not shown

12  the solitary stub makes the same omission as every paycheck delivered to every non-exempt

13  hourly employee, regardless of position or department, over the relevant multi-year time

14  period.  They have not even shown all class members received paystubs.  Because the plaintiffs

15  bear the burden to show common issues exist and predominate, certification of the wage

16  statement subclass is denied.

17  VII.   CONCLUSION

18          For the above reasons, plaintiffs' motion to certify the class is GRANTED IN

19  PART and DENIED IN PART.

20      1.      The motion to certify the general class is GRANTED IN PART:

21          a.      Certification of the class and each subclass is DENIED as to defendant

22              SlingShot Connections, LLC.

23          b.      Certification of the donning and doffing subclass is DENIED.

24          c.      Certification of the mixed hourly worker subclass is GRANTED in part, as

25              to meal break claims, and DENIED in part, as to rest break claims.  Plaintiffs

26              Pena, Hernandez, and Morris are approved as subclass representatives.

42

1         d.  Certification of the waiting time subclass is GRANTED in part and

2             DENIED in part.  As granted, this subclass is derivative of the mixed hourly

3             workers subclass.  Plaintiffs Pena and Hernandez are approved as subclass

4             representatives.

5         e.  Certification of the wage statement subclass is DENIED.

6    2.     To the extent certification is denied for any subclass for lack of sufficient

7         evidence, the court does so without prejudice in light of its recent orders on

8         summary judgment and the lifting of the discovery stay effected by this order.

9         Should the plaintiffs file a renewed motion for class certification, they may in

10        the same motion seek leave to amend the complaint and make substitutions of

11        named plaintiffs.  However, before filing any renewed motion for class

12        certification, plaintiffs' counsel shall meet and confer in person with defendants'

13        counsel and, fourteen days before filing any such motion, arrange for the filing

14        of a joint statement reporting on the meet and confer efforts and the parties'

15        positions with respect to a renewed motion.  Upon receipt of such a joint

16        statement, the court may set a special status.

17    3.     Plaintiffs' counsel is approved as class counsel.

18    4.     The stay on discovery is LIFTED.

19    5.     A status conference is SET for March 19, 2015, at 2:30 p.m.  The parties shall

20        file a joint report no later than seven days before the conference.

21        IT IS SO ORDERED.

22  DATED: February 9, 2015.

23

24                        _____

25                 UNITED STATES DISTRICT JUDGE

26